# UNITED STATES *v.* CONNECTICUT NATIONAL BANK ET AL.

No. 73–767.   Argued April 23, 1974—Decided June 26, 1974

*Howard E. Shapiro* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Kauper, Robert B. Nicholson,* and *John W. Clark.*

*George D. Reycraft* argued the cause for appellees Connecticut National Bank et al. With him on the brief were *John Boyer, Haven C. Roosevelt,* and *Richard G. Bell. Lee Loevinger* argued the cause for appellee Comptroller of the Currency. With him on the brief were *Robert Bloom* and *Charles H. McEnerney, Jr.*

MR. JUSTICE POWELL delivered the opinion of the Court.

This case concerns the legality of a proposed consolidation of two nationally chartered commercial banks operating in adjoining regions of Connecticut. The United States brought a civil antitrust action challenging the

consolidation under § 7 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 18. Following a lengthy trial and on the basis of extensive findings and conclusions, the United States District Court for the District of Connecticut dismissed the Government's complaint. 362 F. Supp. 240 (1973). The Government brought a direct appeal pursuant to the Expediting Act, 32 Stat. 823, as amended, 15 U. S. C. § 29, and the Court noted probable jurisdiction, 414 U. S. 1127 (1974).

The banks desiring to consolidate, Connecticut National Bank (CNB) and First New Haven National Bank (FNH), have offices in contiguous areas in the southwestern portion of Connecticut. CNB maintains its headquarters in the town of Bridgeport, which is situated on the Long Island Sound approximately 60 miles from New York City. CNB is the fourth largest commercial bank in the State. At year-end 1972, it held 6.2% of the deposits in commercial banks in Connecticut. CNB operates 51 offices located in Bridgeport and nearby towns in the extreme southwest section of Connecticut.

FNH has its headquarters in the town of New Haven, approximately 19 miles to the northeast of Bridgeport along the Long Island Sound. FNH is the eighth largest commercial bank in Connecticut. At the end of 1972, it held 4.1% of commercial bank deposits in the State. FNH operates 22 bank offices in New Haven and surrounding towns.

In Connecticut as a whole at the end of 1971, the five largest commercial banks held 61% and the 10 largest commercial banks held 83% of the deposits in such banks in the State. Two large commercial banks based in Hartford, Connecticut Bank & Trust Co. of Hartford and Hartford National Bank, operate essentially statewide. At year-end 1972, they had 41% of the total commercial bank deposits held by Connecticut banks.

CNB and FNH both have offices and are in direct competition in a so-called "four-town area" located between Bridgeport and New Haven. The banks assured the District Court, however, that in implementing the consolidation they would divest themselves of a sufficient number of offices in the four-town area to render insignificant the degree of overlap of their areas of actual operation. The District Court held that this divestiture plan eliminated any antitrust difficulties presented by the merger of direct competitors. 362 F. Supp., at 268–270, 286. The United States has not pursued the point on appeal. Accordingly, the case has been presented to us strictly as a geographic market extension merger on the part of both banks. The proposed consolidation would join the banks under FNH's national charter (with headquarters in Bridgeport). It would have no effect on the number of banks operating in either the Bridgeport or New Haven area. In that posture, the case presents potential-competition issues similar to those raised in *United States* v. *Marine Bancorporation, Inc., ante,* p. 602.

The District Court rejected the Government's potential-competition arguments, relying on such factors as state-law restraints on *de novo* branching,[1] the expan-

---

[1] Under state law in Connecticut, commercial banks may not branch into a town containing the main office of another bank (the so-called "home office protection" provision). Conn. Gen. Stat. Rev. § 36–59 (1972). Towns that contain the main office of a bank are referred to as "closed" towns. The remaining towns are "open towns." The term "town" in Connecticut refers to a political subdivision of the State, somewhat analogous to counties in other States. It does not denote a metropolitan area, although some cities are more or less congruent with the towns in which they are located.

There are 169 towns in Connecticut. The effect of the "home office protection" provision is to create a checkerboard of "open" and "closed" towns reflecting the location of the main offices of the

sion plans and capabilities of the two banks, the posture of national and state regulatory officials regarding the issuance of new bank charters, and the existence and economic feasibility of possible foothold acquisitions. 362 F. Supp., at 286–288. As we have held today in the *Marine Bancorporation* case, these and analogous factors are the appropriate considerations to take into account in determining the legality under § 7 of the Clayton Act of geographic market extension mergers by commercial banks. We are unable, however, to reach the question of whether the District Court correctly assessed the import of those factors in the instant case. We have also held in *Marine Bancorporation* that the legality of a market extension merger must be determined against the backdrop of properly defined product and geographic markets. See *ante,* at 618. In our view, the District Court erred in its definition of both concepts, and it is not possible to ascertain the degree, if any, to which those errors may have influenced its conclusions with regard to the Government's potential-competition arguments. Accordingly, the District Court's judgment must be vacated and the case remanded for reconsideration.

I

The District Court concluded that the appropriate "line of commerce" within the meaning of § 7 included both commercial banks and savings banks. 362 F. Supp., at 281. The court recognized that its conclusion departed from this Court's holdings in, *e. g., United States* v. *Phillipsburg National Bank,* 399 U. S. 350, 359–362 (1970), and *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 356–357 (1963). But in the District Court's

banks operating in the State. State law forbids any bank that does not have its headquarters in Connecticut from operating banking offices within the State. Conn. Gen. Stat. Rev. § 36–59 (4).

view the pronouncements in *Phillipsburg National Bank* and *Philadelphia National Bank* "were not intended to be ironclad, hard and fast rules which require a court to don blinders to block out the true competitive situation existing in every set of circumstances." 362 F. Supp., at 280.

Several factors led the District Court to the conclusions that "savings banks are in direct and substantial competition with commercial banks in providing product-services to the banking consumers in Connecticut . . . ," and that "[t]he cold, hard realities of the situation are that savings and commercial banks are fierce competitors in this state." *Ibid.* The court noted that under state law savings banks in the near future will be permitted to offer one of the traditional indicia of commercial banks, personal checking accounts. See Conn. Pub. Act No. 73–195 (May 14, 1973). It pointed out that savings banks in Connecticut compete with commercial banks for real estate mortgages, personal loans, IPC (individual, partnership, and corporate) deposits, and, the court found, commercial loans. 362 F. Supp., at 280. It cited *United States* v. *Continental Can Co.,* 378 U. S. 441 (1964), for the proposition that "complete industry overlap" is not required to establish a relevant line of commerce under § 7. 362 F. Supp., at 281. It also relied on the omission of the "in any line of commerce" phrase from the Bank Merger Act of 1966, 12 U. S. C. § 1828 (c)(5)(B), an Act which in other essential respects tracks the language of § 7 of the Clayton Act.[2] Finally, it distinguished

---

[2] See 362 F. Supp., at 281. The relevant provision of the Bank Merger Act of 1966, 80 Stat. 8, 12 U. S. C. § 1828 (c)(5)(B), proscribes any bank consolidation:

"Whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless . . . the anticompetitive effects of the proposed transaction are clearly out-

*Philadelphia National Bank, supra,* and *Phillipsburg National Bank, supra,* by pointing to the absence of significant competition by savings banks in the relevant geographic markets in those cases. 362 F. Supp., at 281. The District Court's conclusion on the appropriate line of commerce caused it to "shade" (*i. e.*, to reduce) the Government's concentration ratios to take into account the presence of savings banks. *Id.*, at 285.

We are in complete agreement with the District Court that *Phillipsburg National Bank* and *Philadelphia National Bank* do not require a court to blind itself to economic realities. Similarly, we have no doubt on this record that savings banks and commercial banks in Connecticut are "fierce competitors," see 362 F. Supp., at 280, to the degree that they offer identical or essentially fungible services. The District Court was also correct that "complete inter-industry competitive overlap need not be shown." *Continental Can Co., supra,* at 457. As the Court declared in *Continental Can,* "we must recognize meaningful competition where it is found to exist." 378 U. S., at 449. Nonetheless, we hold for several reasons that the District Court was mistaken in including both savings and commercial banks in the same product market for purposes of this case.

---

weighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served."

Section 7 of the Clayton Act, 38 Stat. 731, as amended, 64 Stat. 1125, 15 U. S. C. § 18, by comparison provides in pertinent part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

Two of the District Court's reasons may be dealt with briefly. The court erred as a matter of law in concluding that the absence of a "line of commerce" phrase in the Bank Merger Act of 1966 alters traditional standards under § 7 of the Clayton Act for defining the relevant product market in a bank merger case. *United States* v. *Third National Bank,* 390 U. S. 171, 182 n. 15 (1968). See *Phillipsburg National Bank,* 399 U. S., at 359–362. Moreover, the absence of significant competition from savings banks in *Philadelphia National Bank, supra,* and *Phillipsburg National Bank, supra,* is not determinative. The commercial banks in both of those cases faced significant competition from savings and loan associations and other credit institutions. See, *e. g.,* 374 U. S., at 357 n. 34; *United States* v. *Phillipsburg National Bank,* 306 F. Supp. 645, 649 (NJ 1969). The Court in both instances nevertheless viewed the business of commercial banking as sufficiently distinct from other credit institutions to merit treatment as a separate "line of commerce" under § 7. Analogous distinctions, although perhaps not as sharply defined, are controlling here.

We believe that the District Court overestimated the degree of competitive overlap that in fact exists between savings banks and commercial banks in Connecticut. To be sure, there is a large measure of similarity between the services marketed by the two categories of banks.[3] In

---

[3] As we have noted, the District Court identified some of the services offered by both savings and commercial banks, including real estate mortgages, personal loans, and time deposits. As the District Court put it in another context, it would be "ostrich-like," 362 F. Supp., at 254, to assume that the two types of banks are not in direct and vigorous competition with regard to the services they share or are not viewed by many bank customers as more or less fungible for purposes of those services. Cf. *United States* v. *Phillipsburg National Bank,* 399 U. S. 350, 360 (1970). That savings and commercial banks are direct competitors in some submarkets, how-

our view, however, the overlap is not sufficient at this stage in the development of savings banks in Connecticut to treat them together with commercial banks in the instant case. Despite the strides that savings banks in that State have made toward parity with commercial banks, the latter continue to be able to provide a cluster of services that the former cannot, particularly with regard to commercial customers, and this Court has repeatedly held that it is the unique cluster of services provided by commercial banks that sets them apart for purposes of § 7.

The Court declared in *Phillipsburg National Bank, supra,* at 360:

> "*Philadelphia Bank* emphasized that it is the *cluster* of products and services that full-service banks offer that as a matter of trade reality makes commercial banking a distinct line of commerce. Commercial banks are the only financial institutions in which a wide variety of financial products and services—some unique to commercial banking and others not—are gathered together in one place. The clustering of financial products and services in banks facilitates convenient access to them for all banking customers. . . ." (Emphasis in original.)

From the vantage point of at least one significant consumer of bank services—the commercial enterprise—commercial banks in Connecticut offer a "cluster of products and services" that their savings bank counterparts do not. The facts of this case indicate that the differences in what commercial banks in the State can offer to that important category of bank customers are sufficient to establish commercial banking as a distinct line of commerce.

The District Court concluded that "meaningful competition" existed between commercial and savings banks

---

ever, is not the end of the inquiry, as *Phillipsburg* makes clear. *Ibid.*

for commercial loans. 362 F. Supp., at 280. This conclusion is not supported by the record. Commercial loans, generally speaking, are relatively short-term loans to business enterprises of all sizes, usually for purposes of inventory or working capital. At the end of 1971 commercial banks in Connecticut had outstanding $1.03 billion in commercial loans.[4] Savings banks, by comparison, had $26 million in such loans at that time.[5] The disparity in these figures demonstrates that the commercial bank-loan business in Connecticut is controlled almost exclusively by commercial banks. Moreover, commercial banks in the State offer credit-card plans, loans for securities purchases, trust services, investment services, computer and account services, and letters of credit. Savings banks do not.

It is true that under state law savings banks soon will be able to provide some checking account services. Conn. Pub. Act No. 73–195 (May 14, 1973).[6] This will increase the degree of direct competition between savings banks and commercial banks, because demand deposits have traditionally been a unique attribute of the latter institutions. But even this new authority for savings banks will not allow them to serve commercial customers, who constitute a significant percentage of the clientele of commercial banks. The state statute empowering savings banks to offer demand deposits forbids those banks from marketing the service to anyone "for the purpose of, or in connection with, the carrying on of any business, trade, occupation or profession." *Id.*, §§ 1 (a), 5. Thus,

---

[4] App. 1793.

[5] *Id.*, at 1795.

[6] The pertinent provisions of Conn. Pub. Act No. 73–195 will take effect no later than December 31, 1975, although the enactment of certain federal legislation or other specified events not relevant here may trigger those provisions at an earlier date. See *id.*, § 7.

under the new Act, savings banks will be restricted to offering personal checking accounts. *Id.*, § 2.

We do not say, and *Phillipsburg National Bank, supra,* and *Philadelphia National Bank, supra,* do not say, that in a case involving a merger of commercial banks a court may never consider savings banks and commercial banks as operating in the same line of commerce, no matter how similar their services and economic behavior. At some stage in the development of savings banks it will be unrealistic to distinguish them from commercial banks for purposes of the Clayton Act. In Connecticut, that point may well be reached when and if savings banks become significant participants in the marketing of bank services to commercial enterprises. But, in adherence to the tests set forth in our earlier bank merger cases, which we are constrained to follow, we hold that such a point has not yet been reached. Accordingly, on remand the District Court should treat commercial banking as the relevant product market.

## II

The District Court ruled that the relevant geographic market, or "section of the country," under § 7, is the State as a whole. 362 F. Supp., at 283. We think the District Court erred on this point for several reasons. If the State were the relevant geographic market, it would then be appropriate to analyze this not as a potential-competition case but as a direct-competition case involving the consolidation of two firms holding an aggregate market share of approximately 10%. Even if this figure is "shaded" by a factor of 10% to account for the influence of banks in New York, see *id.*, at 260; *Philadelphia National Bank,* 374 U. S., at 364 n. 40, the consolidation of CNB and FNH would create a firm holding a 9% share of statewide commercial-bank deposits. Mergers between direct competitors producing smaller shares

of less concentrated markets have been held illegal under § 7. *E. g., United States* v. *Von's Grocery Co.,* 384 U. S. 270 (1966).

The State cannot be the relevant geographic market, however, because CNB and FNH are not direct competitors on that basis (or for that matter on any other basis pertinent to this appeal). The two banks do not operate statewide, nor do their customers as a general rule utilize commercial banks on that basis. The offices of the two banks are restricted to adjoining sections of the southwest segment of Connecticut. Although the two banks presumably market a small percentage of their loans to large customers on a statewide or broader basis, it is undoubtedly true that almost all of their business originates locally. For example, "about 88% of CNB's total deposit business derive[s] from the towns in which CNB has offices." 362 F. Supp., at 250. As the District Court noted in a finding that is inconsistent with its conclusion on the appropriate section of the country, "[c]ommon sense . . . would indicate that the relevant market areas of CNB and FNH generally coincide with where each has established branch offices." *Ibid.*

As indicated by our opinion today in *Marine Bancorporation, ante,* p. 602, the relevant geographic market of the acquired bank is the localized area in which that bank is in significant, direct competition with other banks, albeit not the acquiring bank. This area must be defined in accordance with this Court's precedents in prior bank-merger cases. Yet the District Court's conclusion on this issue conflicts with *Philadelphia National Bank, supra.* The Court emphasized in that case:

> "In banking, as in most service industries, convenience of location is essential to effective competition. Individuals and corporations typically confer the bulk of their patronage on banks in their

local community; they find it impractical to conduct their banking business at a distance. . . . The factor of inconvenience localizes banking competition as effectively as high transportation costs in other industries." 374 U. S., at 358 (footnote and citations omitted).

In recognition of the local character of the great majority of commercial bank activities, *Philadelphia National Bank* indicated that the relevant geographic market in bank-merger cases must be drawn narrowly to encompass the area where "the effect of the merger on competition will be direct and immediate." *Id.*, at 357. Moreover, the geographic market must be delineated in a way that takes into account the local nature of the demand for most bank services. It "must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for [alternatives] . . . ." *Id.*, at 359 (citations, internal quotations, and italics omitted). Because the economic scale of separate categories of consumers of bank services will vary, a workable compromise must be struck "to delineate the area in which bank customers that are neither very large nor very small find it practical to do their banking business . . . ." *Id.*, at 361.[7]

On remand the District Court must determine pursuant to the localized approach denoted above the geographic market in which CNB operates and to which the bulk of its customers may turn for alternative commercial bank services. It must do the same with regard to FNH, for this case presents the unusual fact situation of a consolidation of two banks, each with a history of *de novo* geographic expansion, rather than the acquisition of

---

[7] The Court's approach in *Philadelphia National Bank* to defining geographic markets for commercial banks was reaffirmed in *Phillipsburg National Bank*, 399 U. S., at 362–365.

a geographically stable bank as in *Marine Bancorporation, ante,* p. 602. The task is important, because the definition of the respective geographic markets determines the number of alternative avenues of entry theoretically open to CNB in piercing FNH's area of significant competitive influence and vice versa.

We are not unaware of the difficulty of the assignment confronting the District Court. An element of "fuzziness would seem inherent in any attempt to delineate the relevant geographical market." *Philadelphia National Bank, supra,* at 360 n. 37. The task is made especially taxing here by the fragmented character of the distribution of the banking offices of the two banks, especially CNB. Apparently because the Connecticut branching statute has created a checkerboard of "open" and "closed" towns, see n. 1, *supra,* CNB and FNH have not expanded in the past in a manner that produced readily definable, completely covered areas around the towns where they have their home offices. There is, for example, a gap consisting of four towns in the extreme southwest section of Connecticut in which CNB has no offices, although it has established offices in almost all of the surrounding towns in that part of the State. That gap presumably will have to be excluded from consideration on remand.

The difficulty of the responsibility imposed on the District Court with regard to defining the geographic markets of the two banks is ameliorated by several considerations. First, the burden of producing evidence on this subject is on the Government. The Government repeatedly notes that it is not required to define geographic markets by "metes and bounds," citing *United States* v. *Pabst Brewing Co.,* 384 U. S. 546, 549 (1966). To the extent that this means that such markets need not—indeed cannot—be defined with scientific precision, it is accurate. But it is nevertheless the Government's role to come forward with evidence delineating the rough approximation

of localized banking markets mandated by *Philadelphia National Bank, supra,* and *Phillipsburg National Bank, supra.*

Second, we affirm that portion of the District Court's judgment holding that the Government cannot rely, without more, on Standard Metropolitan Statistical Areas (SMSA's) as defining the geographic markets of the two banks. See 362 F. Supp., at 249–250, 281–282. SMSA's are prepared by the Office of Management and Budget to determine areas of economic and social integration, principally on the basis of the commuting patterns of residents.[8] They are not defined in terms of banking criteria, and they were not developed as a tool for analyzing banking markets. *Id.,* at 249. Exclusive reliance on SMSA's here may lead to inaccuracies. For example, as the District Court noted, only 57% of CNB's deposits originate from the Bridgeport SMSA. *Id.,* at 250, 282. This is because CNB's offices extend to several areas outside the Bridgeport SMSA. The Bridgeport SMSA is relevant, if at all, only to the CNB offices located in Bridgeport, and even then it is at best a crude indicator. The same is true of the New Haven SMSA and the FNH offices located in the town of New Haven. In sum, although the Bridgeport and New Haven SMSA's may be helpful in defining the general metropolitan characteristics of southwest Connecticut, they are not sufficiently refined in terms of realistic commercial banking markets to satisfy the Government's burden. The Government must demonstrate more accurately than is possible solely with SMSA's the localized banking markets, or areas of significant competitive influence, surrounding the sites where CNB and FNH maintain their banking offices.[9]

---

[8] App. 1435–1437.

[9] The federal bank regulatory agencies define a bank's service area as the geographic area from which the bank derives 75% of

Third, the District Court may not, as the banks would have it, rely solely on towns as the relevant geographic markets. The towns served by the two banks are highly significant geographic units, because state law restraints on *de novo* branching are defined in terms of towns. See n. 1, *supra.* But not all towns are closed to *de novo* branching by one or the other bank, and it seems fair to assume that the area of significant competitive influence of some bank offices may extend beyond town boundaries.

On remand, the District Court must delineate the localized banking markets surrounding the sites where CNB and FNH maintain their bank offices. It must then evaluate the economically and legally feasible alternative methods of entry, if any, into those areas available to one bank or the other. In so doing, it should keep in mind the considerations outlined today in *Marine Bancorporation, ante,* p. 602.[10]

---

its deposits. See 362 F. Supp., at 250. The service-area concept may be considerably more useful in this case than SMSA's, although this is a matter we leave to the District Court on remand.

In *Marine Bancorporation, ante,* at 619, we affirmed the District Court's determination of the Spokane metropolitan area as the relevant geographic market. That holding was not an affirmation of SMSA's as banking markets; SMSA's were not at issue in that case. The Spokane metropolitan area was defined as the relevant geographic market in *Marine Bancorporation* because it is an insulated banking market, is comparatively small by geographic standards in the Western States, contains all the banking offices of the target bank, and is the area from which that bank draws some 90% of its deposit accounts.

[10] We note that it is not at all clear that the District Court's holdings as to potential competition were based on a statewide appraisal of the consolidation at issue, despite its conclusion that the State was the relevant section of the country. For example, the court's findings with regard to "toehold" acquisitions refer to SMSA's, towns, and service areas, 362 F. Supp., at 265, and its conclusions under the heading of "potential competition" speak of service area, service

## III

In conformity with its approach in *Marine Bancorporation,* the Government argues that the State as a whole, although not a banking market, is nonetheless a "section of the country" within the meaning of § 7 of the Clayton Act. The Government repeats the concern expressed in *Marine Bancorporation,* see *ante,* at 620, that a statewide linkage of oligopolies "may" arise and that large banks across the state "may engage" in more standardized behavior as a result.[11] Moreover, the Government contends that a statewide approach is appropriate because the challenged consolidation would eliminate one of eight banks in Connecticut with the potential for statewide operation. "Thus the effect of a merger which eliminates even one of these banks will be felt statewide, for it will have an impact in every local market in the state where that bank does not currently operate but which it *might* otherwise enter." [12]

We reject the Government's statewide approach here, as we did in *Marine Bancorporation, ante,* at 620. The Government's argument that "a geographic area need not be a banking market to be a section of the country . . ." [13] is foreclosed by the precedents. *Ante,* at 620–622. Its theory of linked oligopolies appears to be as devoid of evidentiary support here as it was in *Marine Bancorporation.* Finally, its concern for any area of the State in which CNB or FNH "might" enter independently of the con-

---

market, and towns. *Id.,* at 286–287. Because the District Court did not clarify what local area, if any, it considered controlling for purposes of the potential-competition doctrine, we are unable to hold that its error in denoting the State as the relevant section of the country, see *id.,* at 283, may be ignored.

[11] Brief for United States 34.

[12] *Id.,* at 33 (emphasis added).

[13] *Id.,* at 31.

solidation is too speculative to establish a case under the Clayton Act. In advancing the latter argument, the Government borders on espousing a *per se* rule against geographic market extension mergers by Connecticut commercial banks so long as any town in the State remains open to *de novo* branching. On remand the District Court will address itself to the geographic markets in which CNB and FNH presently operate.[14]

The judgment is vacated and the case is remanded for further consideration consistent with this opinion.

*It is so ordered.*

MR. JUSTICE WHITE, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL join, concurring in part and dissenting in part.

Although I agree with Part I of the majority opinion, as to the relevant line of commerce, I dissent from that part of the opinion dealing with the determination of a relevant geographic market.

The Court holds that "the relevant geographic market of the acquired bank is the localized area in which that bank is in significant, direct competition with other banks, albeit not the acquiring bank," relying on a statement to similar effect in *United States* v. *Marine Bancorporation, Inc., ante,* p. 602. Accordingly, the Court rejects the proposition, which the appellee banks accepted

---

[14] The District Court also concluded that assuming, *arguendo,* that the consolidation violated the Clayton Act, it nonetheless met the standards of the "convenience and needs" test of the Bank Merger Act of 1966, 12 U. S. C. § 1828 (c)(5)(B). 362 F. Supp., at 288. Its findings on the "convenience and needs" defense are not controlling, however, if it erred in the standards applied in judging the status of the consolidation under the Clayton Act. *United States* v. *Third National Bank,* 390 U. S. 171, 183–184 (1968). See also *Phillipsburg National Bank,* 399 U. S., at 369–370.

below,* that the merger of FNH and CNB should be analyzed in terms of its effect on possible potential competition in areas not in or adjacent to the New Haven and Bridgeport markets, however those markets are to be defined.

There is certainly nothing in this Court's past cases on mergers under Clayton § 7 which requires this result. Even if Bridgeport and New Haven are relevant geographic markets, there can be more than one relevant geographic market in which to test the possible effects of a merger. Section 7 of the Clayton Act speaks to lessening competition "in *any* section of the country" (emphasis added), and as the majority acknowledges in *Marine Bancorporation, ante,* at 621 n. 20, in *United States* v. *Pabst Brewing Co.,* 384 U. S. 546 (1966), the Court "held that the Government had established three relevant markets in which the acquired firm actually marketed its products—a single State, a multi-state area, and the Nation as a whole." To be sure, the selection of any relevant geographic market in a banking case must be chosen in terms of the needs of the customers and the area in which sellers operate, *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 357–359 (1963), but this may result in several possible markets, especially in a potential-competition case where a merger might affect the economic behavior of existing firms in various markets.

As I read the majority opinion, if one assumed that FNH and CNB were the two largest banks in Connecticut, and, although located in southwest Connecticut, both had the capability and interest to enter a concentrated banking market in northeast Connecticut, it would be improper for the Government to oppose their merger, since

---

*One of the principal witnesses presented by the appellee banks, Dr. Peck, analyzed the effect of this merger, and the removal of FNH as a potential competitor, along with CNB, on the various banking markets in the State.

neither bank had as yet entered the northeast Connecticut banking market. The majority describes the possibility of such dual entry as "too speculative." *Ante,* at 673. What is a relevant geographic market is an issue entirely distinct from who is a potential competitor. It is obvious, for example, that while New Haven and/or its environs is a relevant market of banking competition, it may nonetheless be true that CNB may not prove to be a potential competitor with respect to that market. It, therefore, follows that whether the banking market in northeast Connecticut is a relevant banking market, is a question entirely separate from whether FNH and/or CNB should be considered potential competitors in that market, and whether the elimination of one of those competitors lessens either the possibility of deconcentration in that market or, under the "wings theory," affects present competition in that market. Since the majority professes to leave issues of potential competition to the District Court on remand, it should not preclude a finding that this merger will affect banking competition in areas of the State other than Bridgeport or New Haven. The possibility of finding many banking markets in Connecticut is an entirely separate matter from finding one banking market in the State under a theory of statewide linkage of oligopolies. The latter assumes that a section of the country need not be a banking market; the former does not.

I agree that the case should be remanded. As I understand the task of the District Court, once it has decided what the relevant geographic markets are, the case is to be analyzed in terms of the "wings theory" of potential competition enunciated in *United States* v. *Falstaff Brewing Corp.,* 410 U. S. 526 (1973), and the deconcentration theory now accepted by this Court in *Marine Bancorporation.* As to these matters, I adhere to my views as stated in *Marine Bancorporation.*