### UNITED STATES of America, Plaintiff,

### v.

### The FEDERAL COMPANY, Defendant.

### No. C–72–382.

United States District Court,
W. D. Tennessee, W. D.

June 30, 1975.

---

Thomas F. Turley, Jr., Memphis, Tenn., Gary Cohen, Charles S. Stark and Thomas E. Kauper, Dept. of Justice, Antitrust Div., Washington, D. C., for plaintiff.

Kenneth F. Clark, Jr., Memphis, Tenn., Henry P. Sailer, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McRAE, District Judge.

### Introduction

1. On January 31, 1972, The Federal Company ("Federal"), through its Dixie Portland Flour Mills, Inc. subsidiary (Dixie Portland), acquired The Great Western Foods Company. The acquisition was accomplished through Dixie Portland's purchase of all the outstanding capital stock of Great Western Foods Company from its parent, Great Western United Corporation, for approximately $3,500,000 and the name was thereafter changed to The White Lily Foods Company. The Company has since been operated as a subsidiary of Dixie Portland. TX 1, ¶ 11.

2. On November 13, 1972, the Government filed a civil antitrust complaint alleging that this acquisition violates Section 7 of the Clayton Act. 15 U.S.C. § 18. The Government alleges that the effect of the acquisition may be substantially to lessen competition or tend to create a monopoly by eliminating actual and potential competition between these two firms, and increasing concentration in the wheat flour milling market and its bakery flour and family flour submarkets in the southeastern portion of the United States.

The relief sought is that Federal be required to divest itself of its interest in White Lily, and that Federal be enjoined for a period of ten years from acquiring the stock or assets of any other company engaged in the production and sales of wheat flour, bakery flour, or family flour in the southeastern region of the United States. Complaint.

3. Fededal is a corporation organized and existing under the laws of the State of Delaware. Its principal office is located in Memphis, Tennessee. It transacts business and is found in the West-

ern District of Tennessee, Western Division. At the time of the acquisition, subsidiaries of Federal were engaged in interstate commerce. TX 1.

4. At the time of the acquisition, Federal's subsidiaries included Dixie Portland Flour Mills, Inc. v. Cosby-Hodges Milling Company. Dixie Portland was engaged almost entirely in the milling of wheat and the sale of products produced therefrom. The great majority of its sales consisted of bakery flour. It operated flour mills at Arkansas City, Kansas; Chattanooga, Tennessee; and Chicago, Illinois. During fiscal 1971 (ending May 1971), Dixie Portland had total sales of $72,608,000, and net income of $2,508,000 before taxes. Cosby-Hodges Milling Company was engaged, among other things, in the distribution and sale of family flour, which it obtained from Dixie Portland. TX 1, ¶ 7. References to "Federal" hereafter in these findings include Federal's two subsidiaries engaged in the milling of wheat and sale of flour, Dixie Portland and Cosby-Hodges, but not the subsidiary White Lily.

5. At the time of the acquisition, White Lily was a wholly-owned subsidiary of Great Western United Corporation and was engaged in interstate commerce. White Lily's business consisted of the milling of wheat and corn and the sale of products made in whole or in part therefrom. Its only mill was located in Knoxville, Tennessee. During fiscal 1971 (ending May 1971), White Lily had total sales of $16,202,000, and net income of $621,000 before taxes. TX 1.

*Product Markets*

*(a) Family Flour*

6. Family flour is flour milled from soft or hard wheat or a blend of the two, packaged for ultimate use in the home—usually in 2, 5, 10, and 25 pound bags—and distributed, directly or indirectly, to the grocery stores for sale to the homemaker. TX 1, ¶ 19. Family flour represents only a small percentage of the total wheat flour produced or consumed in the United States. TX 26, table 3; TX 85, 86. The parties have stipulated that family flour is a line of commerce. TX 1, ¶ 20.

*(b) Bakery Flour*

7. Bakery four is wheat flour sold to commercial (wholesale, retail) and institutional (hospitals, restaurants, etc.) bakers of bread, rolls and similar products and to manufacturers of cookies and crackers. TX 1, ¶ 22. The parties have stipulated that the bakery flour is a line of commerce. TX 1, ¶ 23.

*(c) Wheat Flour*

8. Plaintiff contends that wheat flour is also a relevant line of commerce in this case. As defined by plaintiff, wheat flour means all the products of the wheat milling process, including family flour, bakery flour, ingredient flour, industrial flour, durum flour and millfeed. Complaint, ¶ 5(a); TX 1, ¶ 18.

9. The evidence shows that there is no reasonable interchangeability of use or cross-elasticity of demand among the various products derived from the wheat milling process. Thus, family flour is flour suitable for the wide range of home baking needs and is sold in sacks or bags almost entirely through grocery stores to the housewife. Stout, TR 243; TX 1, ¶ 18. Bakery flour consists of different blends of either hard wheat flour, which is sold to commercial and institutional bakers of bread, rolls, and similar products, or soft wheat flour, which is sold to cookie and cracker manufacturers. Stout, TR 242; TX 1, ¶ 18. Ingredient flour is flour blended to particular specifications for use in the manufacture of prepared baking mixes, cereals and other products such as sauce thickeners. TX 1, ¶ 18. Industrial flour is a low-grade flour used to make products such as starch and glue. Toevs, TR 296; TX 1, ¶ 18. Durum flour, made from durum wheat, is used to manufacture spaghetti and other pasta products. Stout, TR 243; Toevs, DT (Deposition Transcript) 20; TX 1,

¶ 18. Millfeed is a byproduct of the wheat milling process and is sold primarily as animal feed. TX 1, ¶ 18; Toevs, DT 11.

10. The evidence establishes that the various products derived from the wheat milling process have different physical compositions and are not substitutes for one another. Toevs, TR 296–97, 401–02. They are sold at different prices to different customers for different uses. Stout, TR 243–44; Toevs, TR 297–98. There is not a fixed relationship in price among them. Stout, TR 244; Toevs, TR 298; Pearson, DT 23 (different pricing systems for family flour and bakery flour). Each product is usually sold by different personnel. Stout, TR 244–45; Toevs, TR 298–99; Stout, DT 13; Owens DT 33–35.

11. Plaintiff introduced a number of publications apparently intended to show public or industry recognition of wheat flour as a line of commerce. The Court finds, however, that the terms "wheat flour" as used in the trade does not include millfeed, as it does in plaintiff's proposed market, and that "wheat flour" should not be considered as a homogenous entity. TR 31–32, 40–41; TX 12, p. 2; TX 13, p. 2; TX 15, pp. 2–4; TX 17, pp. 5–6.

### Geographic Markets

### Family Flour—Southeastern United States

12. For the purposes of this case the Southeastern United States consists of the States of Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia. The parties have stipulated, and the Court finds, that the Southeastern United States is a relevant "section of the country" within which to determine the competitive effects of the acquisition in the family flour product market. TX 1, ¶ 27.

13. The evidence shows that the family flour market in the Southeast is distinct from the rest of the nation in several significant respects. Per capita consumption of family flour is significantly higher in the Southeast than in the nation generally. Stout, TR 246; Fraboni, DT 9, 11. The Southeast is also the area where self-rising family flour originated, and unlike the rest of the nation, self-rising flour is the dominant type of family flour sold there. Stout, TR 246; Fraboni, DT 9. The Southeast also exhibits a greater preference to a soft wheat family flour that is especially suitable for baking biscuits. Fraboni, DT 9. In that area there is also a greater preference for family flour sold in relatively larger quantities, such as 10 and 25 pound and even larger bags. More family flour is also sold in cotton bags in the Southeast than in the nation generally. Stout, TR 246. In addition, there are more local brands of family flour, more small mills, and more competitors in the family flour market in the Southeast than in the nation generally. Fraboni, DT 9, 12; Chase, DT 10, 12–13. The Southeast also is recognized as a separate market for family flour by both family flour producers and various statistical services and studies. Stout, TR 246; Toevs, TR 304; Chase, DT 11, 20; Fraboni, DT 7, 9–10.

### Family Flour—Six-State Area

14. Plaintiff claims that a six-state area, consisting of the States of Alabama, Georgia, Kentucky, Tennessee, North Carolina, and South Carolina, is also a relevant "section of the country," within which to determine the competitive effects of the acquisition with respect to family flour. However, the record shows that there are no commercial factors which would serve to distinguish the six-state area from the Southeast generally, and that the factors which distinguish the Southeast from the rest of the country exist throughout the Southeast. Cross, TR 208–209; Stout, TR 247. The six-state area exhibits no unique characteristics in either the production or consumption of family flour. There is nothing distinctive about either the retail or wholesale price of family flour within the six-state area as com-

pared to the Southeast generally. Stout, TR 247. The six-state area is not recognized by either family flour producers or by any statistical service or study as constituting a separate market for family flour. Stout, TR 248; Toevs, TR 305. See Fraboni, DT 20–21.[1]

15. Family flour firms located outside the six-state area ship substantial quantities of family flour into the six-state area. Stout, TR 247. Firms located inside ship quantities of family flour to areas outside. Stout, TR 247–48. Plaintiff introduced evidence showing the States to which the leading family flour firms in the Southeast market shipped their flour. An examination of that evidence clearly shows that the firms involved that were located outside the Southeast shipped substantial quantities of family flour to all points in the Southeast, both within and without the six-state area, and that the firms located within the six-state area shipped substantial quantities of family flour to many points outside that area. The geographic sales patterns of these firms did not correspond to the six-state area. See TX 46–55, 59–63, 66, 67, 70, 72, 137, 138, 139.

16. The testimony of the vice-president in charge of sales for a large wholesale grocery operation in the Southeast showed that family flour distributed by his firm through its warehouses servicing the six-state area originated in most instances from mills located outside the six-state area. This evidence further establishes that consumers in the six-state area can and do turn for significant alternative supplies of family flour to firms located outside the six-state area. Saviori, TR 310–13.

17. Plaintiff's evidence did not show that its proposed six-state area corresponded to the commercial realities of the family flour business. The evidence did not establish distinctive patterns of consumption or production of family flour in the six-state area. The evidence did not establish that consumers within the six-state area cannot practically turn to outside firms for alternative supplies of family flour.

### Bakery Flour—Southeastern United States

18. The parties have stipulated, and the Court finds, that the Southeastern United States is a relevant "section of the country" within which to determine the competitive effects of the acquisition with respect to bakery flour. TX 1, ¶ 27.

19. Plaintiff claims that a four-state area, consisting of the States of Georgia, Tennessee, North Carolina, and South Carolina, is also a relevant "section of the country" within which to determine the competitive effects of the acquisition with respect to bakery flour.

20. The four-state area is not recognized by persons in the industry as constituting a separate market for bakery flour. Stout, TR 248–49. Firms located outside the four-state area ship substantial quantities of bakery flour into the four-state area. Stout, TR 249; Feeny, DT 12–13. Also, firms located inside the area ship substantial quantities of bakery flour outside the four-state area. Consumers within the four-state area can thus turn for alternative supplies of bakery flour to firms located outside that area. There is nothing unique about the price structure of bakery flour within the four-state area as compared with the Southeast generally. Stout, TR 249. Nor are there any freight rate structures which would in any way serve to distinguish the four-state area as a separate market. Stout, TR 248. Apart from White Lily, there is no firm which sells bakery flour throughout the four-state area and only a small proportion elsewhere.

---

1. TX 139 (Pillsbury's family flour sales districts do not correspond to state boundaries and it does not collect sales information on a state basis.)

*Competitive Effects of the Acquisition Family Flour*

(a) *Concentration*

21. Plaintiff's trial witness, an economist employed by the Antitrust Division of the Department of Justice, testified that the "standard rules of thumb" used by the economists to determine the existence of a concentrated market were "about seventy percent [of the market controlled by] the top eight firms and about fifty [percent] by the top four firms." Masson, TR 109, 158. Plaintiff's trial exhibit 106, which purports to show the market shares of the leading family flour firms in the Southeast at the time of the acquisition, indicates that the cumulative market share of the eight largest firms was 63.5% and that the cumulative market share of the four largest firms was 44.1%. TX 106. According to plaintiff's trial exhibit 115, at the time of the acquisition the cumulative market share of the eight largest family flour firms in plaintiff's proposed six-state area was 66.9% and the cumulative market share of the four largest firms was 45.2% TX 115. Plaintiff's own evidence also established that the family flour market in the Southeast and in its proposed six-state area was far *less* concentrated than the national family flour market. Compare TX 106 and 115 with TX 103.

22. Plaintiff's evidence with respect to concentration fails to take into account the difference between advertised, premium family flour brands, unadvertised family flour brands, and private label family flour. The record shows that any competition among these different kinds of family flour is attenuated. Toevs, TR 299–301, 366, 379–82; Saviori, TR 313–16. Some of the firms listed in plaintiff's exhibits mainly sell highly advertised brands, while others mainly sell relatively unadvertised brands or private labels. Except for White Lily, Federal, for example, mainly sells unadvertised brands and private labels, while firms such as White Lily, General Mills, and Pillsbury mainly sell advertised brands. Stout, TR 249–50; Toevs, TR 291, 299–301; TX 24. It is apparent that the simple addition of the market shares of these firms would not reflect the competitive reality of the family flour market in the Southeast or in the proposed six-state area.

(b) *Absence of Trend Toward Increased Concentration*

23. Plaintiff introduced several exhibits which purported to show that the number of wheat-grinding mills and firms in the nation and in the Southeast has decreased. TX 87–89, 92. The percentage of annual milling capacity controlled by the leading "wheat flour milling" firms has increased somewhat in recent years. TX 90, 92–97. Plaintiff's exhibits relating to "wheat flour milling" capacity or changes in such capacity of leading firms are based on a magazine entitled *The Northwestern Miller*. These exhibits include TX 90, 92–97. Although *The Northwestern Miller* is a much used and well recognized magazine, the probative value of the exhibits based upon it must allow for a margin of error. A witness who had over fifty-six years of experience in the milling business and who had personal knowledge of the reports made to *The Northwestern Miller* by the largest milling firms in the nation and the Southeast, including General Mills, Colorado Milling and Elevator Company, and Veneer Industries, testified that the capacity figures reported in *The Northwestern Miller* "should not be construed to be accurate." Cross, TR 209–10, 224–25. On cross-examination, Mr. Cross further explained that "one of the basic principles of business is that you do not divulge to your competitors many, many phases of your business, and for that reason I repeat that those figures are approximations and should not be construed to be accurate." TR 225.

24. The capacity figures reported by *The Northwestern Miller* are directly contradicted in some instances by the milling capacity figures reported in another of plaintiff's trial exhibits—a pub-

lication by a government-sponsored organization, the National Commission on Food Marketing. TX 15, p. 14; TR 57–60, 62, 116. Compare TX 15, table 2–5, p. 14, with TX 32, p. 11. These discrepancies, sometimes exceeding 18%, again detract from the liability of *The Northwestern Miller* and therefore the exhibits based on it. Dr. Masson, plaintiff's trial witness, stated that such discrepancies could be attributable to many factors and that he would not consider a divergence of 15% between reported capacities to be "surprising." Masson, TR 154–55. The above-mentioned exhibits are also contradicted by another of plaintiff's exhibits which, on the basis of U.S. Bureau of Census data, shows that the cumulative market share of the leading wheat flour firms in the nation decreased continuously from 1954 to 1967. TX 18, p. 3.

25. The record shows that family flour represents only a small percentage of total wheat flour. TX 26, table 3, p. 4; TX 86; Masson, TR 131. Further, the proportion of family flour produced by various milling companies varies greatly, some producing a large proportion and others producing none. Cross, TR 227; Stout, TR 240. Thus one cannot determine whether any supposed trend in concentration in "wheat flour milling" capacity in general would also obtain for family flour. Moreover, plaintiff's exhibits show only the geographic location of mills. They do not give an indication of where the flour produced by the mills was shipped or sold. Thus even if the data in the exhibits were to be accepted as wholly accurate, that data does not provide a basis for a finding with respect to trends in concentration in the sale of even wheat flour in the Southeast or the six-state area, and *a fortiori* no basis for any such finding with respect to the sale of family flour.

*(c) No Substantial Lessening of Competition*

26. At the time of the acquisition, Federal's share of the family flour market in the Southeast was only 3.68%,

and White Lily's share was 6.95%. Federal's share of that market had been declining precipitously for many years, and between 1968 and 1974 it declined from 5.26% to 2.41%. TX 136.

27. The record shows not only that Federal had a very small and rapidly declining share of the family flour market in the Southeast at the time of the acquisition, but also, that for other reasons as well, Federal and White Lily were not substantial competitors in the sale of family flour. Federal's family flour business consisted mainly of its sales of unadvertised, non-premium brands and private label family flour. Stout, TR 249–50; TX 24. Private labels are brands owned by the customer, usually the wholesale grocer, rather than the milling company. Saviori, TR 313. White Lily's family flour business, on the other hand, consisted mainly of its sales of its advertised and well received premium "White Lily" brand. Toevs, TR 291, 293; TX 24. The "White Lily" brand, and the advertised, premium brands in general, sell for a higher price than the unadvertised brands and the private labels. Toevs, TR 293–94; 366; Saviori, TR 314. At the time of the acquisition, Federal and White Lily did not regard each other as competitors in the family flour business. Stout, TR 268; Toevs, TR 295–96; Stout, DT 26. Moreover, because of the erosion in its family flour business, Federal did not consider itself active in the family flour market. Stout, TR 268–69.

28. Advertised premium brands do not substantially compete with unadvertised brands and private labels. This lack of substantial competition is shown by the fact that where White Lily sells both unadvertised brands and the advertised "White Lily" brand to the same customer, and has a promotion on the unadvertised brands, the sales of its unadvertised brands increase, but the sales of "White Lily" are unaffected. Similarly, when a customer of White Lily's has a promotion on its private labels, the sales of such brands increase, but the

sales of "White Lily" are unaffected. Moreover, where White Lily has a promotion on its unadvertised brands, and one of its customers also has a promotion on its private labels at the same time, sales of both increase, but again the sales of the "White Lily" brand are unaffected. Toevs, TR 299–301. At the time of the acquisition, White Lily in the ordinary course of its business kept track of the prices at which the advertised, premium brands were sold, but made no effort to keep track of the prices of the private labels. Toevs, TR 294–95. This practice indicates that White Lily, in the ordinary course of its business, regarded only the advertised, premium brands as substantial competitors. This is corroborated by the vice-president in charge of sales for Malone and Hyde, a large wholesale grocer which also owns over 45 retail grocery stores in the Southeast, testified that when his company has promotions on its private labels, at either the wholesale or retail level, the sales of such private labels increase, but the sales of the advertised, premium brands are unaffected. He explained that the increased sales of private labels were achieved by drawing business away from Malone & Hyde's competitors, the chain stores, and specifically those store's sales of private labels, not advertised brands. Saviori, TR 313–16.

29. The evidence also establishes that Federal and White Lily were for the most part selling their family flour to different kinds of wholesale and retail customers at the time of the acquisition. Federal sold its family flour primarily to independent wholesale grocers, who in turn distributed the flour to small retail grocers in rural areas. Stout, TR 250–51, 268–69, 271. White Lily, on the other hand, distributed its family flour primarily to large chain stores and co-ops whose retail stores were located in urban areas. Stout, TR 268–69; Toevs, TR 294–95.

30. From 1965 to 1974, Federal's family flour shipments in the Southeast declined by 80%. TX 135; Stout, TR 251. From 1968 to 1971, such shipments declined by 46%. TX 135. This rate of decline in Federal's family flour business has vastly exceeded the rate of decline in family flour consumption in the Southeast. TX 135; Stout, TR 253.

31. The reasons for the decline in Federal's business relate to the type of family flour it sells and the method by which it is distributed. Traditionally, Federal's family flour business consisted of its sales of about fifty unadvertised, non-premium brands. It sold these brands to independent wholesale grocers, who in turn promoted them to the small retail grocers with whom they dealt. Federal thus depended on the wholesale grocers to stimulate sales of Federal's brands through contact with the retail grocers. Federal also depended on the retail grocer, particularly in the mom and pop country stores, to promote its unadvertised, non-premium brands to their customers. In recent years, significant changes have occurred in the distributional system. Many of the wholesale and retail grocers, particularly those in rural areas, have gone out of business and have been replaced by large chain and co-op operations. Family flour is now sold at the wholesale level through computerized-ordering systems, and there is no sales effort at the retail level. As a result, advertised brands have replaced unadvertised brands such as Federal's. In addition, the economic condition of the Southeast has improved, and the consumers who previously bought the cheaper, unadvertised brands are now buying the advertised brands sold in supermarkets. Stout, TR 250–51.

32. The factors resulting in the erosion of Federal's competitive position in the family flour business are objective economic circumstances beyond its control. Stout, TR 252–53. Federal's efforts to arrest the decline in its family flour business have been unavailing. In about 1964, it attempted to introduce a new advertised brand called "Gingham

Girl." After substantial expenditures, the project ended in failure, and Federal discontinued it. Stout, TR 251; Stout, DT 26–27. Federal's family flour cost per unit is high. Stout, TR 252. In 1972, family flour represented only 4.5% of Federal's total flour and millfeed business in the Southeast, while bakery flour represented 73.5%. Stout, TR 253; TX 84.

### Bakery Flour

#### (a) Concentration

33. Plaintiff presented evidence indicating that at the time of the acquisition the cumulative market shares of the eight largest bakery flour firms in the Southeast was 76.4% and that the cumulative share of the four largest firms was 63.4%. TX 102. Similar figures are shown for plaintiff's proposed four-state area. TX 112. The evidence thus shows that there was some concentration in the bakery flour market in the Southeast.

#### (b) Absence of Trend Toward Increased Concentration

34. Plaintiff presented no probative evidence that the bakery flour market in the Southeast, or in its proposed four-state area, was undergoing a trend toward increased concentration at the time of the acquisition. The evidence introduced by plaintiff which was claimed to show a trend toward increased concentrations of the bakery flour market at the time of acquisition is identical to the evidence claimed to show a trend toward concentration with respect to the family flour market in the Southeast. See TX 87–98. The evidence did not establish that the cumulative market shares of the leading bakery flour firms in the Southeast or in its proposed four-state area had increased during any period prior to the acquisition. Plaintiff introduced several exhibits showing alleged changes in concentration in "wheat flour milling" capacity for mills located in various geographic areas; however, most of these exhibits relate not to the Southeast but to a national "wheat flour mill-ing" market which neither party has claimed to be an appropriate "section of the country" for measuring the competitive effects of the acquisition in this case.

#### (c) No Substantial Lessening of Competition

35. At the time of the acquisition, White Lily's share of the bakery flour market in the Southeast was 2.4%, and Federal's share was 16.2%. TX 102. Another of plaintiff's exhibits purports to show that White Lily's share of the proposed four-state bakery flour market was 3.7%, and that Federal's share was 27.7%. See TX 112. However, for the reasons previously stated, the plaintiff's four-state area is not an appropriate "section of the country" in this case.

36. At the time of the acquisition, Federal and White Lily were less significant competitors of each other in the bakery flour market in the Southeast and in plaintiff's proposed four-state area than the foregoing market share figures would indicate. The evidence shows that hard wheat bakery flour and soft wheat bakery flour are sold to different kinds of customers for different uses. Stout, TR 242–43; Pearson, DT 17–18, 20; Feeney, DT 23–24. At the time of the acquisition, approximately 85% of Federal's bakery flour shipments in the Southeast consisted of hard wheat bakery flour. Stout, TR 242–43. White Lily sold almost no hard wheat bakery flour in the States of Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, Virginia and West Virginia. TX 125; Toevs, TR 302–03. In 1972 White Lily lost its only hard wheat bakery flour customer in South Carolina and no longer had any bakery flour sales in that state. Toevs, TR 303. White Lily's hard wheat bakery flour sales were overwhelmingly concentrated near its plant in Knoxville, Tennessee. Prior to the acquisition, White Lily did not consider Federal as a major competitor of White Lily in the bakery flour market in the Southeast. Toevs, TR 305.

*Geographic Location With Respect To
the Bakery Flour Market*

37. Wheat flour milling companies located in the Southeast have a competitive advantage over mills located in other regions, which attempt to sell bakery flour in the Southeast, due to transportation rates for wheat over those for flour. This competitive advantage has particular impact in the hard wheat (or "bread type") bakery flour market. The Southeastern wheat flour milling companies best situated to take advantage of the freight rate differentials are those with mills located on the Tennessee River, i.e., the so-called 'Tennessee River' Mills. Such location enables them to utilize barges in the importation of wheat. The rates for barging wheat to these mills, and thereafter shipping flour to Southeast customers are lower than the cost of shipping flour into the Southeast from outside regions. TX 64, Owens DT 11–15; TX 74; TX 75; Pearson DT 6–11; Deatrick DT 8–9; Feeney DT 8–11; TX 119.

38. The freight rate advantage of the Tennessee River mills over their outside competitors averages between 15 cents to 30 cents per hundredweight. Pearson Dep., p. 16; TX 119; Owens DT 13. As a result, some of the nation's largest wheat flour millers, including Pillsbury and International Multifoods, have not shipped the hard wheat or bread flour to the Southeast bakery flour market. TX 64, 8; TX 74, ¶ 5; Pearson DT 9. However, in some measure this is due to the basic premise that flour can be sold cheaper closer to where it is milled. Furthermore, there has been a transition for various economic reasons from the neighborhood miller to the corporate producer. We have come a long way from homemade biscuits to brown and serve rolls.[2]

39. The 'Tennessee River' milling companies are Federal at Chattanooga; Great Western, ConAgra, Seaboard Allied Milling Co., and White Lily at Knoxville. TX 64, App. A; Owens DT 15, 26–27; Pearson DT, 10–11.

40. The defendant presented evidence in an attempt to show that, had Federal not acquired White Lily, it was overwhelmingly likely that for objective economic reasons the latter's sole production facility, its Knoxville, Tennessee mill, would have been shut down, putting White Lily out of the bakery flour business entirely, and that any competition that existed between Federal and White Lily in the sale of bakery flour would thus have been completely eliminated, entirely apart from the acquisition. Cross TR 177–207; Toevs 323–42; Chilton 358–61. Although the proof reflects many reasons for closing the Knoxville mill, the Court does not find that had Federal not acquired White Lily that the Knoxville mill would have been shut down.

## CONCLUSIONS OF LAW

Section 7 of the Clayton Act provides in part as follows:

"No corporation engaged in commerce shall acquire . . . the whole or any part of the stock . . . of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

■ 1. Family flour is a "line of commerce" within the meaning of Section 7 of the Clayton Act. 15 U.S.C. § 18.

■ 2. The Southeastern United States is a "section of the country" within the meaning of Section 7 of the Clayton Act within which the effect of the acquisition on competition in the sale of family flour may appropriately be measured. 15 U.S.C. § 18.

■ 3. Plaintiff has failed to show by a preponderance of the evidence that

2. Homemade as used herein means biscuits made from scratch with flour and lard.

the acquisition of White Lily by Federal is likely substantially to lessen competition in the sale of family flour in the Southeastern United States. *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

4. Bakery flour is a "line of commerce" within the meaning of Section 7 of the Clayton Act. 15 U.S.C. § 18.

5. The Southeastern United States is a "section of the country" within the meaning of Section 7 of the Clayton Act within which the effect of the acquisition on competition in the sale of bakery flour may appropriately be measured. 15 U.S.C. § 18.

6. Plaintiff has failed to show by a preponderance of the evidence that the acquisition of White Lily by Federal is likely substantially to lessen competition in the sale of bakery flour in the Southeastern United States. *United States v. General Dynamics Corp., supra; Brown Shoe Co. v. United States, supra.*

7. The six-state area, consisting of Alabama, Georgia, Kentucky, Tennessee, North Carolina, and South Carolina, is not a section of the country within which the effect of the acquisition on competition in the sale of family flour may appropriately be measured. *United States v. Connecticut National Bank*, 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 978 (1974); *United States v. Bethlehem Steel Corp.*, 168 F.Supp. 576, 599 (S.D. N.Y., 1958).

8. Even if the six-state area were a section of the country within which the effect of the acquisition on competition in the sale of family flour may appropriately be measured, plain-tiff has failed to show by a preponderance of the evidence that the acquisition of White Lily by Federal is likely substantially to lessen competition in the sale of family flour in that area. *United States v. General Dynamics Corp., supra; Brown Shoe Co. v. United States, supra.*

9. The four-state area, consisting of Georgia, Tennessee, North Carolina, and South Carolina, is not a section of the country within which the effect of the acquisition on competition in the sale of bakery flour may appropriately be measured. *United States v. Connecticut National Bank, supra.*

10. Even if the four-state area were a section of the country within which the effect of the acquisition on competition in the sale of bakery flour may appropriately be measured, plaintiff has failed to show by a preponderance of the evidence that the acquisition of White Lily by Federal is likely substantially to lessen competition in the sale of bakery flour in that area. *United States v. General Dynamics Corp., supra.*

11. "Wheat flour" as defined by plaintiff is not a line of commerce within the meaning of Section 7 of the Clayton Act. *United States v. Connecticut National Bank, supra; Brown Shoe Co. v. United States, supra.*

12. Even if "wheat flour" as defined by plaintiff were assumed to be a line of commerce within the meaning of Section 7 of the Clayton Act, plaintiff has failed to show by a preponderance of the evidence that the acquisition of White Lily by Federal is likely substantially to lessen competition in the sale of wheat flour in the Southeastern United States. *United States v. General Dynamics Corp., supra.*