John Clifford **HEATER**, Individually and as an alleged officer of Universal Credit Acceptance Corporation and International Credit Card Corporation, Petitioner,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 73-1750.

United States Court of Appeals,
Ninth Circuit.

Sept. 11, 1974.

Alfred L. Young, San Mateo, Cal., for petitioner.

Calvin J. Collier, Gen. Counsel, Harold D. Rhynedance, Jr., Asst. Gen. Counsel, and William A. E. Doying, Federal Trade Commission, for respondent.

Before KOELSCH and DUNIWAY, Circuit Judges, and ANDERSON,* District Judge.

OPINION

KOELSCH, Circuit Judge:

John Clifford Heater petitions for review of an order of the Federal Trade Commission concerning his "Honor All Credit Cards" business. 15 U.S.C. § 45(c).

The order in question not only directs petitioner to discontinue the unfair and deceptive business practices found to have been committed by him and the several corporations which he controlled, directed and personally managed, but in addition and in effect commands him to make restitution of the moneys secured by those practices.[1]

This refund provision is based upon and reflects a far-reaching construction of the clause in Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(b), which empowers the Commission to order a person using any unfair method or deceptive act or practice in commerce to "cease and desist from using such method of competition or such act or practice."

The principal question on this review is this: does the Commission under the "cease and desist" provision possess power to order the refund in ques-

---

* The Honorable J. Blaine Anderson, United States District Judge for the District of Idaho, sitting by designation.

1. Universal Credit Acceptance Corp., et al., [1970–73 Transfer Binder] Trade Reg.Rep.

¶ 19,938 (Hearing Examiner's Initial Decision, March 14, 1972) ; Universal Credit Acceptance Corp., et al., [1970–73 Transfer Binder] Trade Reg.Rep. ¶ 20,240 (FTC Final Order to Cease and Desist, Feb. 16, 1973).

tion. We conclude that the answer is "no." [2]

The thrust of petitioner's contention is that the Commission's remedial powers are limited to ordering the offender "to cease and desist from using such method." He reads the "cease and desist" language as limiting the Commission's power to prohibit future illegal or improper conduct and as a denial of power to punish or assess damages for such past conduct. He argues that restitution is unnecessary to bring to an end the misconduct found against him and that the order, stripped of subterfuge, constitutes an attempt to punish him and to award damages to private persons.

The Commission rejects petitioner's contention as simplistic. In its view the "critical question is whether the Commission acted within its power in concluding that it was an unfair practice for Heater to retain moneys of which he had bilked the franchisees and members." If so, the Commission concludes the order is wholly valid—it is merely the ordinary order to cease and desist from a violation of the Act. Indeed, the Commission argues, as it is the only order that will bring the illegal conduct to an end, its refund provision is manifestly within the legislative grant of broad remedial discretion. *See, e. g.,* Jacob Siegel Co. v. Federal Trade Commission,

327 U.S. 608, 613, 66 S.Ct. 758, 90 L.Ed. 888 (1946).

Countering petitioner's argument, the Commission asserts that the order is aimed prospectively at the continuing failure to refund, that it imposes neither a punitive sanction nor compels the payment of reliance or expectancy damages [3] and that it serves the public interest independent of any incidental private benefit. *See* Porter v. Warner, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); Virginia Electric & Power Co. v. N. L. R. B., 319 U.S. 533, 63 S. Ct. 1214, 87 L.Ed. 1568 (1943).

In support of its position the Commission urges that retention of the moneys is properly deemed "unfair" because the practices by which they were obtained were themselves unfair and in violation of the Act,[4] because the defrauded persons, thinking they have no legal recourse, continue to be deceived, and because of the resultant distortion in the credit card market. In short, the Commission contends that the power vested in it extends not only to prohibiting the deceptive practices themselves but to remedying the secondary effects of those practices.

We are fully aware that the Act was drawn to give the Commission wide latitude in defining the statutory proscription of "unfair" trade practices,[5] that the Commission is not limited to con-

---

2. Accordingly, we need not, and do not, resolve various ancillary issues raised by petitioner concerning the scope of the order.

3. The Commission deleted the portion of the Hearing Examiner's initial order directing petitioner to reimburse franchisees for plane fares, because, although the moneys were spent in reliance upon misrepresentations by respondents and were an element of the franchisees' damages, they were not funds received by the respondent corporations.

4. The Commission emphasizes that petitioner's conduct was not simply a. technical violation of the Act. "This is not a case of a business practice which, but for the guidance of the Commission in its capacity as interpreter of the broad proscriptions of § 5, could colorably have been considered legal and proper

—this is a case, in popular vernacular, of a 'bunco' operation, a confidence game." (FTC Brief at 19.)

5. The Senate Committee on Interstate Commerce, when reporting out the original Act, stated in the report:

"The Committee gave careful consideration to the question as to whether it would attempt to define the many and variable unfair practices which prevail in commerce and to forbid their continuance or whether it would, by a general declaration condemning unfair practices, leave it to the commission to determine what practices were unfair. It concluded that the latter course would be better, for the reason, as stated by one of the representatives of the Illinois Manufacturers' Association, that there were

demning simply violations of antitrust laws or acts deceptive in themselves (Federal Trade Commission v. Sperry & Hutchinson Co., 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972)), and that the Commission, in making a determination of unfairness, may properly consider these factors:

"'Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking. 29 Fed.Reg. 8355 (1964)." 405 U.S. at 244 n. 5, 92 S. Ct. at 905.

As an abstract proposition, it is undoubtedly permissible to view the secondary effects of unfair or deceptive practices as "unfair." [6] The Commission's contention, therefore, reflects a not implausible construction of the Act, although command of an affirmative remedial act through an order to "cease and desist" from doing that act involves, at the least, some departure from the common connotation of those words.[7]

However, we reject that contention. The reason is fundamental. The construction placed by the Commission upon its power to define and prohibit "an unfair act or practice" would, if accepted, operate to invest the Commission with remedial powers which are inconsistent and at variance with the over-all purpose and design of the Act. In particular, it would permit the Commission to order private relief for harm caused by acts which occurred before the Commission had declared a statutory violation, and thus before giving notice that the prior conduct was within the statutory purview. Such an order, we think, is impermissible, regardless of the prospective public harm which might be

---

too many unfair practices to define, and after writing twenty of them into law it would be quite possible to invent others." S.Rep.No.597, 63d Cong., 2d Sess. 13 (1914). The House Conference Report concurred in this rationale:

"It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task." H.R.Rep.No.1142, 63d Cong., 2d Sess. 19.

6. We note that the Commission's argument proves too much. Each of the factors relied upon to support its position can be found in some degree in all cases. As the qualitative judgment that a failure to refund is "unfair" is not readily susceptible to dispute, the FTC position supports restitution as an appropriate remedy in all cases. Moreover, the Commission's approach would equally support the power to order damages or punitive sanctions. The failure to pay reliance or expectancy damages caused by an

unfair practice might itself be considered an "unfair" practice which has a distorting effect on the market. Were it not for jury trial complications, the Commission's expansive definition of its power to remedy ununfair practices would therefore support an order to cease and desist from not paying damages. The Commission concedes that § 5 does not grant it power to order damages.

7. See Note, "Corrective Advertising" Orders of the Federal Trade Commission, 85 Harv. L.Rev. 477, 492–93 (1971).

It is clear that in some circumstances the Commission may order affirmative acts. See, e. g., Federal Trade Commission v. Dean Foods Co., 384 U.S. 597, 606 n. 4, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966) (divestiture order under § 5 of FTCA rather than § 7 of Clayton Act); L. G. Balfour Co. v. Federal Trade Commission, 442 F.2d 1 (7th Cir. 1971) (divestiture); J. B. Williams Co. v. Federal Trade Commission, 381 F.2d 884 (6th Cir. 1967) (Affirmative advertising disclosure); American Cyanamid Co. v. Federal Trade Commission, 363 F.2d 757 (6th Cir. 1966) (mandatory licensing of patent).

prevented or the public interest served by a restitution order based upon a broader definition. In this conclusion we are guided by the legislative history of the Act. From this it appears that the critical issue around which the Congressional debate over the Federal Trade Commission Act centered was the breadth of the Commission's power to define what would constitute "unfair acts." [8] Some lawmakers considered the general standard employed by the statute as it now exists to constitute an excessive delegation of legislative authority,[9] and wanted listed acts proscribed. A principal concern over the generality of the language was the risk that a businessman would be unable to determine whether a particular practice was made unlawful until the Commission and courts gave the general language specific substance.[10]

The Act adopted the general definition standard in order to prevent clever circumvention of a more precise definition, thereby insuring the ability of the Commission to define norms of acceptable business behavior. However, to reconcile the Commission's broad power with the need for a specific notice to an individual who must conform his behavior to the terms of the Act, Congress limited the consequences of violation of the Act to a cease and desist order. It withheld from the Commission the power to make a determination which would expose the businessman to liability for acts occurring before the Commission gave the general definition specific meaning in a factual context. In particular, Congress rejected an amendment which provided a private damage suit based on a Commission finding of a violation of the Act. Senator Newlands, the principal sponsor of the bill and of the broad standard,[11] expressed the argument against inclusion of a damage suit:

"We are entering now upon a new field of inquiry as to what constitutes unfair competition. This commission, and ultimately the courts, will be called upon to make nice distinctions with reference to this matter for the purpose of determining what set of facts and circumstances constitute unfair competition. Here (in the proposed damage suit) we hold this sword of Damocles above every business man in the country, and either compel him to abandon a practice which perhaps he thinks is right, or to pursue litigation to the bitter end, when we want through this instrumentality not to punish, but to secure higher standards of conduct, by rules that will be laid down by this commission and sustained by the court, and which will have an educational effect upon the commerce of the country." 51 Cong.Rec. 13116, 63rd Cong., 2d Sess. (1914).

The broad power to define unfair acts and practices asserted as the basis for the refund order must be read in light of the contemplated non-retroactivity of a Commission decision. As Senator Newlands indicated, the Act was designed to allow the Commission to serve an educational purpose by developing a body of administrative law, through published decisions, defining unfair acts or competition in particular situations on the basis of full knowledge of the facts.[12] The power to attach consequences to prior conduct was thought inconsistent with the Commission's contemplated quasi-legislative and educational function. As a result, recourse for harm suffered before the Commission enters a cease and desist order was left to private suits.[13]

---

8. *See, e. g.*, 51 Cong.Rec. 13114 et seq. (1914).

9. Hart & Sacks, The Legal Process: Basic Problems in the Making and Application of Law 1133 (tent. ed. 1958).

10. *See* 51 Cong.Rec. 13114 (1914) (remarks of Senator McCumber).

11. *See* 51 Cong.Rec. 11084 (1914).

12. *See generally* Hart & Sacks, *supra*, at 1136; Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 480, 72 S.Ct. 800, 96 L.Ed. 1081 (1952) (Jackon, J., dissenting).

13. Our holding denies retroactive impact to a Commission decision, at least insofar as pri-

The impact of the refund order in the present case illustrates the reason Congress did not give the Commission the power it seeks to exercise. So far as it appears from the record, petitioner received only a salary and loans, (some of which have been repaid), from the corporations. The corporations, which actually received the funds, are now bankrupt; the order runs only against petitioner. Aside from whether petitioner is legally liable to refund sums he only constructively received, those funds were expended by the corporations to pay the salaries of employees hired to service accounts and collect member charges. Any assets of the corporations will be applied towards satisfaction of judgments in private civil suits.[14] The Commission's order operates as a determination that, as between petitioner and the innocent franchisees and members, petitioner ought in fairness to pay the losses out of his personal assets. Regardless of how egregious petitioner's conduct, or how unreasonable his reliance on the legality of the operation,[15] the Commission was not given the power to recast the consequences of conduct occurring prior to its entry of an order;[16] Congress was unwilling to subject the operation of a business to the risk of subsequent Commission condemnation.

Moreover, the Congressionally mandated Commission procedures are designed for the determination and expression of the public interest in a particular factual context; they become suspect if employed to adjudicate private rights. The Commission acts as both prosecutor and judge in its own proceeding. The Commission issues the original complaint, a Commission attorney prosecutes, a Commission Hearing Examiner hears the evidence, makes factual findings, and makes the initial judgment of

---

vate rights and liabilities are involved. The Commission has argued that the propriety of an order should not be determined by inquiry into whether the order has prospective or retrospective effect, *see Curtis Publishing Co.,* [1970–73 Transfer Binder] Trade Reg.Rep. ¶ 19,719, 21,753 (Final order to dismiss, Dkt. 8800, June 30, 1971), contending:

"Every Commission order is 'retrospective,' in the sense that it looks to and is based upon the causes and results of the acts found to violate the statute, and at the same time it is 'prospective' in the sense that its design, purpose, and effect is to dissipate any lingering effects of the past violations and to prevent their recurrence in the future."

*Curtis, supra,* at 21,757.

We recognize that divestiture and corrective advertising orders support the Commission's position that it has power, in order to remedy the continuing effects of violations of the Act, to order acts imposing economic costs properly attributed to conduct occurring before the conduct is declared illegal. Moreover, we recognize that there is no economic difference in the impact of those orders and a restitution order—in each case the offender loses the benefits of money expended in reliance on the legality of conduct later found illegal. Nevertheless, the two cases must be treated differently because Congress, out of reasonable fair notice considerations, chose to leave the cure of private injuries caused by violations of the Act to whatever common-law remedies existed.

14. A judgment well in excess of the remaining assets in the bankruptcy estate has already been obtained against the corporations in a class action brought on behalf of the franchisees. Petitioner was dismissed by the settlement stipulation and judgment in that case with prejudice and is not liable personally for amounts not recoverable from the corporations.

15. The Commission argues that notice considerations (*see* n. 4, *supra*) play no part in this case because petitioner's acts were. so patently fraudulent that he must have known his conduct violated the Act. Petitioner contends otherwise. We think it clear that Congress did not create an exception from its prohibition of retroactive sanctions for exceptional violations of the Act. Concern for the need for notice in debatable cases led to the refusal to include retroactive sanctions in general, particularly since common-law remedies were available in extreme cases.

16. We sympathize with the Commission's problem. Under the present design of the Act, those sufficiently unscrupulous or reckless to engage in conduct clearly forbidden by the Act may do so until a cease and desist order is entered, escaping with the fruits of the violation. In many situations no individual has a sufficient interest to bring a suit for redress, and a violation of the Act may be quite profitable. *See* 85 Harv.L.Rev., *supra* n. 7, at 482–86.

whether the Act is violated. An appeal may then be had back to the full Commission, which originally issued the complaint. Court review of the final Commission judgment is limited—the Commission's factual findings are conclusive if supported by substantial evidence. In such circumstances there is a real likelihood that the Commission would, in furtherance of its broad institutional mandate to protect the public interest, expand unduly the common-law liability of the violator.[17] We are certain that had Congress contemplated displacement of a private suit for rescission, under traditional judicial procedures, by an administrative proceeding, under § 5(b) procedures, as the remedy for fraud in the procurement of a contract, it would have said so more explicitly.[18]

We cannot help but note that although the Act has been on the books for sixty years, this is the first time that the Commission has advanced this construction of its power to an appeals court. Of course, non-use of a power is not conclusive of its non-existence, and the Commission's construction of the Act has never been explicitly rejected. However, statements of courts, commentators, and Congress throughout those years uniformly reflect an understanding that the Commission is without the power it seeks to exercise. Justice Brandeis, writing six years after the passage of the Act, stated:

"[I]t is necessary to bear in mind the nature of the proceeding under review. . The proceeding is not punitive. The complaint is not made with a view to subjecting the respondents to any form of punishment. It is not remedial. The complaint is not filed with a view to affording compensation for any injury alleged to have resulted from the matter charged, nor with a view to protecting individuals from any such injury in the future. The proceeding is strictly a preventive measure taken in the interest of the general public." Federal Trade Commission v. Gratz, 253 U.S. 421, 432, 40 S.Ct. 572, 576, 64 L.Ed. 993 (1920) (dissent).

In 1948 the Court reiterated:

"[T]he effect of the Commission's order is not to punish or to fasten liability on respondents for past conduct but to ban specific practices for the future in accordance with the general mandate of Congress." Federal Trade Commission v. Cement Institute, 333 U.S. 683, 706, 68 S.Ct. 793, 92 L.Ed. 1010 (1948).

Henderson, in his landmark work on the Commission, wrote:

"The act does not expressly confer any general power, of the kind possessed by a court of equity, to compel restitution, or otherwise to so mold the decree as to do substantial justice under the circumstances. Of course, no damages can be awarded, or mandatory order entered. Where, therefore, the unfair act has already accomplished its purpose, and there is no occasion for repeating it, the Commission cannot give relief." Henderson, The Federal Trade Commission 71 (1924).

And in 1971 the Senate Committee on Commerce, in reporting out a bill which would have amended the Act to empower the Commission to order refunds, noted:

"At the present time cease and desist orders have prospective application only and afford no specific consumer redress to consumers already injured." S.Rep.No.92–269, p. 24, 92d Cong., 1st Sess. (1971).

17. Here, for instance, and as noted above, the Commission deleted a provision in the Hearing Examiner's order which conditioned individual franchisee's rights to a refund on proof of reliance, ordinarily an element of an action for rescission of a contract procured by fraud.

18. The NLRB, by § 10(c) of the National Labor Relations Act, 29 U.S.C. § 160(c), is explicitly granted broader remedial powers than those granted the FTC. Nevertheless, the Board has interpreted its power not to extend to the award damages for violation of the Act. Ex-Cell-O Corp., 185 NLRB No. 20 (August 25, 1970).

■ We think the foregoing views correctly reflect the scope of the powers given the Commission. The construction the Commission places on its power to define "unfair acts and practices" impermissibly expands the Commission's remedial power beyond that contemplated by Congress or written into the Act. Consumer protection is an important task. However, the Commission's endeavors must be limited to the exercise of powers granted by Congress. If there exists a deficiency in the Act, the cure must come from Congress, not by judicial enlargement of the statute. "To supply omissions transcends the judicial function." Iselin v. United States, 270 U.S. 245, 251, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926) (Brandeis, J.).

The refund provisions of the Commission's final order are set aside.

