**WYOMING BANCORPORATION,**
Petitioner,

v.

**BOARD OF GOVERNORS OF the**
**FEDERAL RESERVE SYSTEM,**
Respondent.

No. 82–1634.

United States Court of Appeals,
Tenth Circuit.

March 12, 1984.

Julius L. Loeser, Chicago, Ill. (Jack B. Speight, Cheyenne, Wyo., on brief), for petitioner.

Kevin J. Handly, Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., Civil Div., U.S. Dept. of Justice, Washington, D.C., Michael Bradfield, Gen. Counsel, Richard M. Ashton, Asst. Gen. Counsel, Bd. of Governors of the Federal Reserve System, Washington, D.C., on brief), for respondent.

Before SETH, Chief Judge, SEYMOUR, Circuit Judge, and CHILSON,* District Judge.

SEYMOUR, Circuit Judge.

Wyoming Bancorporation (Bancorp) appeals from the Federal Reserve Board's denial under the Bank Holding Company Act, 12 U.S.C. § 1841 et seq. (1982) (the Act), of its application to acquire control of the American National Bank of Powell in Powell, Wyoming (American Bank). The Board used Park County, Wyoming as the relevant geographical market within which it analyzed the competitive effects of the proposed acquisition. On appeal, Bancorp asserts that the Board erred as a matter of law in its delineation of the relevant market, and that it failed to provide substantial evidence to support its decision. We affirm.

## I.

## BACKGROUND

As is required by section 1842(a)(3) of the Act, Bancorp applied to the Federal Reserve Board for approval of its proposed acquisition of 80 percent of the voting shares of American Bank. The Board denied Bancorp's application under section 1842(c)(2), which requires disapproval of any proposed acquisition "whose effect in any section of the country may be substantially to lessen competition."

The first step under section 1842(c)(2) is to define the "section of the country" or the "relevant geographical market"[1] within which the Board must examine the competitive effects of a proposed acquisition. In the present case, the Board concluded that Park County, Wyoming was the relevant geographical market. Park County is a sparsely-populated area consisting primarily of mountainous and desert terrain, with some irrigated farmland. It has two main population centers, Cody and Powell.[2] They are twenty-four miles apart with no intervening geographic barriers, connected by a direct and well-maintained highway. The closest town of similar size in Wyoming is Worland, which is about eighty miles from either Cody or Powell. Bancorp owns a bank in Cody (Cody Bank), and the target of the proposed acquisition is in Powell (American Bank).

Having delineated the relevant geographical market, the Board concluded that the acquisition of American Bank would substantially lessen competition among banks in Park County. Bancorp held 23.8 percent of the commercial bank deposits in Park County, and American Bank held 10.8 percent. After the acquisition, Bancorp would become the largest banking organization in the market, its share of market deposits increasing from 23.8 percent to 34.6 percent. In addition, the proportion of market deposits held by the four largest banking organizations would increase from 83.7 percent to 94.5 percent. Accordingly, the Board denied Bancorp's application.

---

* The Honorable Hatfield Chilson, Senior Judge, District of Colorado, sitting by designation.

1. These two phrases are synonymous. See *United States v. Marine Bancorporation,* 418 U.S. 602, 620, 94 S.Ct. 2856, 2869, 41 L.Ed.2d 978 (1974).

2. At the time of the Board's decision, Cody had a population of 6,706 and Powell had a population of 5,302.

Bancorp does not dispute the Board's conclusion that effects like these within a properly-defined geographical market might warrant denying an application, but it argues that Park County is the wrong geographical market. First, Bancorp asserts that the Board erred as a matter of law because it relied improperly on evidence of the general commercial interaction between Cody and Powell when it defined the relevant geographical market. Second, even if use of this evidence is proper, Bancorp contends the Board's order lacks substantial evidence that Park County is the relevant geographical area.

## II.

### PROPER EVIDENCE

■ When defining the relevant geographical market, the "question to be asked ... is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate.... This depends upon 'the geographic structure of supplier-customer relations.'" *United States v. Philadelphia National Bank*, 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963) (citations omitted). More specifically, "the 'area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, *and to which the purchaser can practicably turn for supplies.'*" *Id.* at 359, 83 S.Ct. at 1739 (quoting *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961), and adding emphasis); *see also United States v. Connecticut National Bank*, 418 U.S. 656, 668, 94 S.Ct. 2788, 2796, 41 L.Ed.2d 1016 (1974); *United States v. Marine Bancorporation*, 418 U.S. 602, 619, 94 S.Ct. 2856, 2868, 41 L.Ed.2d 978 (1974); *United States v. Phillipsburg National Bank & Trust Co.*, 399 U.S. 350, 362, 90 S.Ct. 2035, 2042, 26 L.Ed.2d 658 (1970).

Using this analysis, the Board concluded that Park County was the relevant geo-

graphical market, "based on the relative proximity of Powell and Cody, the ready accessibility of each to the other, their positions as the economic, governmental and trade centers of the Park County region, the substantial distance to other comparable commercial centers, and the interaction between the two towns." Rec., vol. IV, at 789. The Board found that "each town offers to residents of the other an available and practical alternative for a variety of commercial and other services, including banking services." *Id.*

In support of this conclusion, the Board relied in part on statistics from the Wyoming State Highway Department that showed substantial traffic on the road between Cody and Powell, most of which could be attributed to local traffic. The Board also found that a variety of factors encourage commercial interaction between Cody and Powell, noting that Cody is the county seat, has the only airport with scheduled air service, has the only orthodontist in the area, and has a small chain of all-night convenience stores. The area's only college is located in Powell. Further, the Board cited a study of checks and other cash items cleared by Cody Bank during a fixed period, and determined that "Powell residents initiate more than 400 cash items per day directly in Cody. In view of the fact that there are approximately 2,000 households in Powell, this activity indicates a substantial reliance on Cody by residents of Powell for goods and services." *Id.* at 787 (footnote omitted).

Bancorp objects to the Board's consideration of this evidence. It correctly points out that the relevant geographical market is not defined by the general commercial activity in an area, but rather must correspond to the commercial realities of the particular industry involved, in this case the banking industry. *See, e.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37, 82 S.Ct. 1502, 1529–30, 8 L.Ed.2d 510 (1962). Bancorp stresses that a part of the commercial reality of the banking industry is the "localized character of commercial banking," *Marine Bancorpora-*

*tion*, 418 U.S. at 622, 94 S.Ct. at 2870; *see also Connecticut*, 418 U.S. at 667–68, 94 S.Ct. at 2795–96; *Phillipsburg*, 399 U.S. at 363–64, 90 S.Ct. at 2043; *Philadelphia*, 374 U.S. at 358, 83 S.Ct. at 1738. This localization of banking arises for a variety of reasons, but the factor most often emphasized is inconvenience. "The factor of inconvenience localizes banking competition as effectively as high transportation costs in other industries." *Philadelphia*, 374 U.S. at 358, 83 S.Ct. at 1738; *see also Connecticut*, 418 U.S. at 667–68, 94 S.Ct. at 2795–96; *Phillipsburg*, 399 U.S. at 362–63, 90 S.Ct. at 2042–43. However, what may be inconvenient to a bank customer in an urban area, who has many alternatives for banking and other services in the immediate vicinity, may not be inconvenient to a customer in a small rural town who is accustomed to traveling long distances to obtain basic services.[3] Thus, the extent to which the residents of Cody and Powell are accustomed to traveling to each other's towns for certain services is relevant to the basic issue of whether residents of Cody and Powell can "practicably turn" to banks in the other town as an alternative to banking in their own town. The Board's use of this evidence as a factor in its decision is not reversible error.

■ Of course, the Board could not rely exclusively upon such data in delineating the relevant banking market, *see Connecticut*, 418 U.S. at 670, 94 S.Ct. at 2797, and it did not. The Board also considered evidence of actual competition between American Bank and Cody Bank. According to the Board's findings, American Bank derived 4 percent of its deposits and 8.7 percent of its loans from Cody residents, while

Cody Bank derived 4.3 percent of its deposits and 2.7 percent of its loans from Powell residents. While neither bank advertised in the newspaper or on the radio of the other town, 13 percent of the Powell newspaper circulation was in Cody and both of the local radio stations could be received in either town. Finally, the Board compared the interest rates charged on loans by each bank over a fifteen-month period. The Board found it significant that, "in 14 of 15 periods cited the changes in rates where [sic] in the same direction or caused the rates to converge." Rec., vol. IV, at 789. The Board concluded from this evidence "that some customers in each town have found it practical to do banking business in the other town and that there is existing competition between the two banks." *Id.* at 788.

To determine the areas where the banks involved operated, the Board considered record evidence relating to where the banks were located, where they drew their deposits and loans, and where they marketed their services. *See id.* at 785, 788–89; *cf. Phillipsburg*, 399 U.S. at 363, 90 S.Ct. at 2043 (giving criteria for locating where the seller operates). To determine where the banks' customers could practicably turn for alternative banking services, the Board examined the proximity of Cody and Powell and the relative convenience of travel between them for residents seeking essential services. *See* rec., vol. IV, at 786–88; *cf. Brown Shoe*, 370 U.S. at 336–37, 82 S.Ct. at 1529–30 ("Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one.").

---

**3.** Thus, the Supreme Court's views on customer preference for localized banking, expressed in the context of an urbanized area, are not determinative of the present case. In *Philadelphia*, the relevant geographical market constituted the fourth or fifth largest urban area in the country in terms of commercial activity. 374 U.S. at 334 n. 10, 83 S.Ct. at 1726 n. 10. In *Marine Bancorporation*, the relevant market included the Spokane, Washington metropolitan area, a total population of about 200,000. 418 U.S. at 607, 94 S.Ct. at 2862. In the case involving the smallest population, *Phillipsburg*, the market was found

to include two adjoining towns and bordering suburbs with a total population of 88,500. 399 U.S. at 353–54, 90 S.Ct. at 2038–39. In contrast, the populations of Powell (5,302), Cody (6,706), and Park County (21,600) demonstrate the clearly rural character of the market defined by the Board. Indeed, as Bancorp itself recognized in an earlier application to the Board, "[i]n Wyoming, residents drive long distances for many services and products. To travel fifty miles ... to bank simply is not extraordinary." Rec., vol. IV, at 664, 788 n. 6.

We conclude that the Board applied the proper legal standard in defining the relevant geographical area, and looked to appropriate evidence in applying that standard. We turn now to whether the Board's decision to use Park County as the relevent market is supported by substantial evidence.

### III.

### SUBSTANTIAL EVIDENCE

■ The findings of the Board are conclusive if supported by substantial evidence. 12 U.S.C. § 1848 (1982). Substantial evidence is that amount of evidence " 'a reasonable mind might accept as adequate to support [the Board's] conclusion.' " *Board of Governors v. First Lincolnwood Corp.,* 439 U.S. 234, 253, 99 S.Ct. 505, 515, 58 L.Ed.2d 484 (1978) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). We have reviewed the entire record, and we cannot say that a reasonable mind would not accept the evidence cited by the Board as adequate to support its conclusion that Park County is the relevant geographical market.[4]

■ If supported by substantial evidence, the conclusions of the Board are entitled to great weight, and we will not reverse even though we might reach a different result if we were making the initial decision on the matter. *Commercial National Bank v. Board of Governors,* 451 F.2d 86, 90 (8th Cir.1971); *see also Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.").

AFFIRMED.

4. We are aware of certain errors in the factual findings relied upon by the Board. The Board implied that Cody had the only chain of all-night convenience stores, whereas in fact a similar chain operates in Powell. *See* rec., vol. IV, at 810, 827–28. Further, the record reveals that the maximum number of vehicles that could

have been going from Powell to Cody or vice-versa during the survey by the Wyoming Highway Department is 2,220 not 2,480. *See id.* at 768. Nevertheless, we find these errors too insubstantial to warrant a different result in this case.