The decision of the district court is, therefore,

AFFIRMED.

**AMREP CORPORATION, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 84–1434.

United States Court of Appeals, Tenth Circuit.

July 25, 1985.

Michael C. Schoeman, Schoeman, Marsh, Updike & Welt, and I. Michael Bayda, Jacobs, Persinger & Parker, New York City (Rothgerber, Appel & Powers, Denver, Colo., with them on the brief), for petitioner.

Frederick E. Dooley, Jr., F.T.C., Washington, D.C. (John H. Carley, Gen. Counsel, Ernest J. Isenstadt, Asst. Gen. Counsel, and George E. Schulman, F.T.C., Washington, D.C., with him on the brief), for respondent.

Before McKAY and DOYLE, Circuit Judges, and BROWN, District Judge [*].

WILLIAM E. DOYLE, Circuit Judge.

Petitioner AMREP Corporation (Amrep) seeks review of a cease and desist order entered against it by the respondent Federal Trade Commission (FTC or Commission) on February 8, 1984. This court has jurisdiction in this case pursuant to 15 U.S.C. § 45(c). We affirm the FTC's order in all respects.

[*] Honorable Wesley E. Brown, United States Senior District Judge, District of Kansas, sitting by designation.

## The Basic Facts

Amrep is an Oklahoma corporation with its principal place of business in New York City. It was first incorporated as American Realty & Petroleum Corporation in 1955.[1] Prior to August, 1961 Amrep was engaged exclusively in operating oil and gas properties in Oklahoma. In August, 1961, however, the company entered the business of acquiring large tracts of unimproved land. It subdivided the land into lots and sold them in the subdivisions to the general public. Amrep's principal business today continues to be selling lots to the public in its subdivisions.

On March 11, 1975, the FTC issued a formal complaint charging that Amrep used unfair and deceptive sales practices in connection with sales of vacant lots in its subdivisions. The complaint centered on the sales practices used in connection with four Amrep subdivisions: Rio Rancho Estates, near Albuquerque, New Mexico; El Dorado at Santa Fe, New Mexico; Silver Springs Shores near Ocala, Florida, and Oakmont Shores, in Missouri. The Commission's complaint was that Amrep had falsely represented to potential buyers that its lots were a safe investment sure to yield short-term profits. It further alleged that Amrep had made false representations concerning the growth rates of the areas in which its subdivisions were located, and that it had falsely represented that land in its subdivisions was steadily increasing in value. It was also alleged that Amrep had made false representations about physical and legal constraints on the growth of Albuquerque that made an investment in land at Rio Rancho Estates appear more attractive to consumers than it actually was. The complaint also alleged that Amrep used unfair high-pressure sales tactics in marketing its lots, and that its prepared form contracts for the purchase of land contained unfair and illegal provisions.

Hearings before an Administrative Law Judge on the complaint began in June,

1. The corporation changed its name to its present form in September, 1967.

1976. They were stayed by order of the United States District Court for the Southern District of New York as of July 30, 1976. This action was taken in order to complete a criminal proceeding against Amrep and its officers in that court. *See United States v. Amrep Corp.*, 405 F.Supp. 1053 (S.D.N.Y.1976), *aff'd without opinion*, 535 F.2d 1240 (2d Cir.1976). The hearings resumed on May 2, 1977, following the completion of the criminal trial conducted by the government. That trial resulted in convictions of Amrep and six leaders on March 10, 1977.[2] They continued intermittently until May 17, 1978. The hearing record was closed on May 31, 1978.

### Discussion of the Evidence

The exhibits and testimony introduced during those hearings revealed that during the time period covered by the FTC's complaint (1961–1975), Amrep had marketed its lots primarily through company-sponsored dinner parties. These parties were held all over the nation, usually far from the Amrep subdivision that was being promoted at the party. Their format did not vary. Prospective buyers (usually husband and wife) were invited to the parties and were seated at small tables (usually two couples together with an Amrep salesman). After the prospective buyers had been served a free dinner and substantial amounts of alcoholic beverages, an Amrep speaker would introduce promotional films on the particular Amrep subdivision that was the subject of the dinner party. These promotional films were produced by Amrep's central office and were described by the Administrative Law Judge as masterpieces of illusion. For example, the Amrep film on El Dorado at Santa Fe made the New Mexico desert bloom through liberal use of green spray paint on the grass shown in the film.

After the conclusion of the films, the speaker gave a brief talk on the particular subdivision in question. The speakers' presentations had been prepared in writing by Amrep's central office in New York. The emphasis was made that Amrep land was a great short-term investment and a sure-fire hedge against inflation. Following the speaker's completed presentation, prospective buyers were pressured into signing land purchase agreements that very night by the salesmen sitting at their tables. These salesmen's tactics had been also dictated by the New York office. The salesmen were told to create artificial excitement by calling out "holds" on particular pieces of property. This was so as to create an artificial impression of increasing property values by stressing that Amrep had dictated increases in the list prices of lots in the subdivision, and to create artificial pressure to purchase land by filling out Amrep-prepared form contracts with required personal data before prospective buyers had indicated their willingness to buy land. These high-pressure tactics led many individuals to buy Amrep land sight unseen.

The individuals who made these sight unseen land purchases were not firmly bound to carry through with them at this time. They had the right to cancel their purchases if they visited the Amrep subdivision where they had purchased land within six months and were not satisfied with their purchases. If they were merely dissatisfied with the particular lot they had purchased, they also had the right to exchange it for another lot of comparable value within the subdivision. To facilitate purchasers' inspections of their lots, Amrep provided chartered trips to its subdivisions. These trips were not conducive to dispassionate inspections of the purchasers' new properties. Indeed these visits were almost as carefully scripted as were Amrep's dinner parties. The purchasers (now known as "homesite owners") were again plied with substantial quantities of alcoholic beverages. During their stay at the subdivision, they were taken on tours of the region's most noteworthy attractions. These views did not include the Amrep

---

**2.** These convictions were affirmed by the United States Court of Appeals for the Second Circuit. *United States v. Amrep Corp.*, 560 F.2d 539 (2d Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978).

subdivision. Purchasers' inspections of their lots were usually limited to a couple of hours on the last day of the trips. If the buyers showed any inclination to cancel their purchases, Amrep's salesmen were instructed to make overly optimistic representations to the buyers about the pace of development in the subdivision and about Amrep's plans for the subdivision's future. The salesmen also stressed the "exchange privilege" and pointed out more desirable lots in other parts of the subdivision. They did not, however, point out that more desirable lots of equal value were often smaller than the lots that the buyers had purchased, or that buyers were required to pay cash "boot" to obtain more desirable lots of a size equal to their original lots. Amrep's tours and exchange privileges were effective in that they served to prevent most buyers from cancelling their land purchase contracts.

Amrep-drafted contracts were, according to evidence introduced at the hearings, rather onerous, in that the contract purchasers did not get possession of their land until they had completed their payments (usually five to eight years) and if they defaulted on any payment, even the very last one, Amrep had the contractual right to terminate the purchaser's interest in the land and keep all payments that had been made as "liquidated damages."

Based on the facts which are described above, the Administrative Law Judge (ALJ) issued a decision on July 18, 1979. It held that Amrep had engaged in unfair and deceptive conduct in connection with its sales of lots in its subdivisions. It also held that the "liquidated damages" clause in its form contracts was an illegal forfeiture clause. The ALJ also issued a proposed cease and desist order. This directed Amrep to stop making certain representations about its land, to make affirmative disclosures to past lot purchasers by means of a letter that was to be sent to them, and to stop enforcing the illegal forfeiture clause in its form contracts. The full Commission affirmed the ALJ's decision in large part in an opinion issued November 2, 1983 and released February 8, 1984. The Commission also modified the proposed cease and desist order. This was in order to make its provisions consistent with requirements imposed by other federal statutes.

Amrep now asks this court to set aside the FTC's decision and order. Its attacks on the FTC's action fall into four categories: (1) attacks on the Commission's regulatory jurisdiction over land sales; (2) alleged procedural irregularities in the Commission's deliberations in this case; (3) alleged deficiencies in the evidence supporting the FTC's decision; and (4) attacks on the scope of the FTC's remedial order. These four categories will be addressed separately below.

### The Commission's Regulatory Jurisdiction

■ Amrep contends that because Congress passed the Interstate Land Sales Full Disclosure Act (ILSFDA), 15 U.S.C. § 1701, *et seq.*, in 1968, the FTC no longer has jurisdiction to regulate interstate land sales. Its argument is based on the principle of statutory construction that when two statutes arguably apply to the same subject matter, the more specific statute applies to the exclusion of the general statute. Amrep asserts that in the ILSFDA, Congress set up a comprehensive and specific registration system and created the Office of Interstate Land Sales Registration (OILSR) within the Department of Housing and Urban Development to enforce it. Amrep concludes that therefore Congress must have intended to oust the FTC, with its more general regulatory mandate to prevent the use of unfair and deceptive trade practices in interstate commerce, and to prevent the FTC from using its jurisdiction to regulate interstate land sales.

We find no merit to Amrep's argument. In effect, Amrep is asking this court to find that Congress, by passing the ILSFDA in 1968, impliedly repealed the FTC's regulatory jurisdiction over unfair trade practices that were connected with land sales opera-

tions. In asking us to so treat the statute, Amrep asks us to disregard "the cardinal principle of statutory construction that repeals by implication are not favored." *United States v. Continental Tuna Corp.*, 425 U.S. 164, 168–69, 96 S.Ct. 1319, 1322–23, 47 L.Ed.2d 653 (1976). We cannot disregard this principle, for, as we recently recognized:

> A specific statute controls over a general statute, *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–2483, 41 L.Ed.2d 290 (1974), but "[t]he courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Id.* at 551, 94 S.Ct. at 2483.

*Pitzak v. Office of Personnel Management*, 710 F.2d 1476, 1478–79 (10th Cir. 1983).

Our research does not reveal any clear indication of congressional intent to negate the FTC's jurisdiction over land sales frauds in the legislative history of the ILSFDA. In view of this we must reconcile the FTC Act and the ILSFDA and give effect to both statutes. This is not a difficult task. The ILSFDA's registration scheme applies to all interstate land sales operations and serves to provide consumers with a basic quantum of information on the operations. In those cases where a developer has used unfair or deceptive sales techniques in the past, however, the minimum levels of disclosures mandated by the ILSFDA may well be insufficient to protect consumers. In those cases the FTC Act comes into the picture. Pursuant to its mandate to extirpate unfair or deceptive trade practices, the FTC may impose more stringent restrictions on conduct and higher disclosure requirements to prevent interstate land developers with bad records from continuing to use deceptive or unfair sales

practices. Thus, the two statutes can be read in a fully consistent manner. These two agencies must learn to cooperate. This is essential to their success.

The only potential problem with allowing both the OILSR and the FTC to regulate interstate land sales is that the FTC might impose duties on a land developer in a cease and desist order that are inconsistent with duties imposed by OILSR under the ILSFDA. It does not follow that this possible difficulty does bar recognition of full effect to both statutes. The FTC will unquestionably use the utmost care to avoid inconsistencies between its cease and desist orders and the ILSFDA's requirements.[3] If the Commission ever failed to do so, a reviewing court could exercise the power given to it by 15 U.S.C. § 45(c) to modify the FTC's order and eliminate the inconsistencies. Therefore, we conclude that the regulatory schemes created by the FTC Act and the ILSFDA are fully consistent. Thus, the FTC did have jurisdiction to maintain this complaint proceeding against Amrep.

### The Commission's Procedures

Having found that the Commission has jurisdiction to regulate Amrep's land sales practices, we proceed to consider Amrep's attacks on the procedures that the Commission used in deciding this case.

■ First we consider Amrep's attack on the sufficiency of the Commission's original complaint. Amrep notes that the complaint contains specific references only to representations used in connection with marketing of its Rio Rancho Estates subdivision. It contends that since the complaint specifically refers only to Rio Rancho Estates, the Commission must not have had "reason to believe" that Amrep used unfair and deceptive trade practices in marketing lots in its Silver Springs Shores,

---

**3.** The Administrative Law Judge in this case in fact recommended an order that included some provisions inconsistent with the ILSFDA's requirements. The Commission recognized the potential problems with the ALJ's proposed order, however, and modified the inconsistent provisions of the order so that they tracked the ILSFDA's requirements.

Oakmont Shores, and El Dorado subdivisions at the time that it issued the complaint. It therefore concludes that the Commission's complaint fails to satisfy the mandate of 15 U.S.C. § 45(b) that the Commission have "reason to believe" that Amrep had engaged in unfair and deceptive trade practices with respect to its Silver Springs Shores, Oakmont Shores, and El Dorado subdivisions, and asks that this court vacate those portions of the FTC's decision and order pertaining to those subdivisions.

We fail to recognize merit in this argument. All that the law requires is that the FTC actually had some "reason to believe" —that is, that it has conducted an investigation—before it issued a complaint. *See, e.g., Standard Oil Company of California v. Federal Trade Commission,* 596 F.2d 1381, 1386 (9th Cir.1979), *rev'd on other grounds,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). Here the FTC had conducted an extensive, corporation-wide investigation of Amrep before it issued the complaint. It discovered that Amrep had used arguably unfair and deceptive trade practices (for example, its arbitrary price increases for lots) in connection with all four of its subdivisions, and it also found that Amrep had made certain deceptive representations that were specifically connected with Rio Rancho Estates. All of these discoveries were set forth in the averments of the Commission's complaint. Those averments are sufficient to indicate that the complaint was issued in full compliance with 15 U.S.C. § 45(b). It also serves to show the Commission had a well-grounded "reason to believe" that Amrep had engaged in unfair and deceptive trade practices in connection with its sales of lots in all of the listed subdivisions. *Cf. Federal Trade Commission v. Standard Oil Company of California,* 449 U.S. 232, 246–47, n. 14, 101 S.Ct. 488, 496–97, n. 14 (1980).

Amrep next attacks the procedures that the Commission used in adopting its November 2, 1983 opinion and order. Although there are many facets to Amrep's attack, the key to its argument is its assertion that the Commission adopted a new legal standard for deciding whether a practice is deceptive before it issued the Amrep decision: that it subsequently erred by applying the old legal standard in the Amrep case.

Amrep argues that the Commission adopted a new deception standard in an October 14, 1983 letter from its Chairman to Representative John Dingell, the Chairman of the House Committee on Energy and Commerce. Amrep suggests that that letter, which said that the Commission would find acts or practices to be deceptive if they were likely to mislead consumers acting reasonably under the circumstances, was a binding policy statement that superseded the Commission's earlier "tendency or capacity to mislead" test for deceptive trade practices. Amrep also contends that since the Commission's letter was a binding policy statement, the Commission could find Amrep's trade practices deceptive only if a majority of the Commissioners found the practices deceptive under the new "reasonable consumer" test. It contends that a majority of Commissioners never found Amrep's practices to be deceptive under the new test.

Amrep notes that the Commission's opinion applied the old "tendency or capacity" test. Two Commissioners joined fully in that opinion. Two other Commissioners issued a concurring statement saying Amrep's conduct would be found deceptive under either the old standard or the new. A fifth Commissioner issued a separate concurring statement indicating that he agreed with the result in the case, but stating that the better approach to deception cases is the "reasonable consumer" approach. This fifth Commissioner, David Clanton, had resigned from the Commission effective October 14, 1983. Accordingly, Amrep contends that his vote should not be counted in deciding whether a majority of the Commission had applied the new standard in its November 2, 1983 opinion. After subtracting Commissioner Clanton's vote, Amrep concludes that only two Commissioners concurred in finding Amrep's practices to

be deceptive under the new test. Accordingly, Amrep asks that this court set aside the Commission's findings of deception because a valid Commission majority did not vote for them.

We reject Amrep's argument. As we recognized above, the key to Amrep's argument is its assertion that the FTC's October 14, 1983 letter to Representative Dingell was a policy statement that bound the Commission in all future cases. However, contrary to Amrep's assertions, the Commission's policy statement did not establish a binding norm that the Commission had to apply in all future cases.

█ It is elementary administrative law that in order for it to have binding force there are only two methods that an agency may use in formulating policy. It may establish binding policy either through rule-making procedures or through adjudications that create binding precedents. *Pacific Gas & Electric Co. v. Federal Power Commission*, 506 F.2d 33, 38 (D.C.Cir. 1974). General policy statements, such as the one at issue in this case, are the result of neither a formal rule-making proceeding nor an adjudication. They are merely public pronouncements of the policy that the agency plans to follow in rule-makings or adjudications. *Id.* Such policy statements have no more binding effect than press releases. It is only when a new standard set forth in a policy statement is adopted in a formal rule-making or adjudication that it becomes a binding norm which the agency must follow in future cases. *Id.*

█ The policy statement at issue in this case was neither the product of a formal rule-making nor the product of an adjudication. Accordingly, the Commission was not bound by it when it decided the Amrep case. It was only when the Commission adopted the standard set forth in the policy statement in a formal adjudication that the standard became the legal standard which the Commission had to apply in all future

deception cases. *See Cliffdale Associates, Inc.*, 3 CCH Trade Reg.Rep. ¶ 22,137 (1984). Thus, in the Amrep case, the Commission was free to use the old deception standard in evaluating Amrep's conduct. The Commission's opinion applied that standard and found that Amrep's conduct had been deceptive. A majority of the Commission concurred in this finding. Accordingly, we affirm the Commission's finding that Amrep had engaged in deceptive trade practices.[4]

█ We now consider Amrep's final procedural argument. It asserts that the Commission's use of a written voting method in this case violated the Government in the Sunshine Act, 5 U.S.C. § 552b. Amrep argues that the Commission was bound to hold open meetings in this case because it involved controversial issues of general public policy (the possible adoption of a new deception standard), and that the Commission could not decide this case by notational voting on a proposed opinion that was circulated to Commissioners sequentially.

█ Once again Amrep's argument lacks merit. The Sunshine Act mandates only that, when an agency holds meetings, they must be open to the public. It does not require agencies to hold meetings, and it permits them to continue to do business by sequential or notational written voting. The D.C. Circuit recently stated:

[An agency] has broad discretion to determine the procedures by which it conducts its business. The Sunshine Act does not require an agency to hold meetings in order to function. *Cf. Communications Systems, Inc. v. Federal Communications Commission*, 193 U.S.App. D.C. 412, 595 F.2d 797 (1979), where we noted that Congress intended to permit agencies to consider and act on agency business by circulating written proposals for sequential approval by individual

---

4. Because we find that the Commission could properly apply its old test for deception, and because an absolute majority of the Commission found Amrep's trade practices to be deceptive under that test, we need not reach Amrep's arguments concerning the validity of Commissioner Clanton's vote in this case.

agency members without formal meetings.

*Pacific Legal Foundation v. Council on Environmental Quality*, 636 F.2d 1259, 1266 (D.C.Cir.1980).

Even if the Sunshine Act established a presumption that agencies should hold public meetings whenever practicable, the Act also contains an exception permitting agencies to hold meetings pertaining to formal adjudications in private. *See* 5 U.S.C. § 552b(c)(10). We believe that this statutory exception would apply in this case. Here, the Commission was specifically considering whether a single corporation, Amrep, had engaged in unfair and deceptive trade practices. In deciding whether Amrep had engaged in such practices, the FTC was required to act as a court, and, "[t]he evident sense of Congress [in adopting the Sunshine Act] was that when a statute required an agency to act as would a court, its deliberations should be protected from disclosure as a court's would be." *Time, Inc. v. United States Postal Service*, 667 F.2d 329, 334 (2d Cir.1981). We conclude that the Sunshine Act is not applicable in this case, and accordingly reject Amrep's argument.

### The Evidence Supported the Commission's Decision

■ Having found the procedures used in this case to be adequate, we now turn to Amrep's attacks on the sufficiency of the evidence supporting the Commission's decision. In considering its arguments, we bear in mind that the FTC Act makes the Commission's factual findings conclusive in this review proceeding as long as they are supported by evidence. *See* 15 U.S.C. § 45(c). Thus, we must affirm the Commission's decision as long as it is supported by sufficient evidence to permit a reasonable mind to accept the Commission's conclusion. *Wyoming Bancorp. v. Board of Governors of Federal Reserve System*, 729 F.2d 687, 691 (10th Cir.1984).

■ Amrep's attack on the evidence supporting the Commission's decision is little more than quibbling with the methodology of the studies that the Commission used to determine the investment value of lots in Amrep's subdivisions. Amrep does not attack most of the Commission's factual findings, including its findings that Amrep used unfair high-pressure sales tactics, made false investment representations (for example, its representations about constraints on the directions in which Albuquerque could grow) and used an illegal forfeiture clause in its form contracts. A review of the record reveals that these unchallenged findings are supported by a substantial quantity of evidence. A review also convinces us that even if we assume that Amrep's attacks on the Commission's investment value studies are correct, the errors that Amrep alleges are so trivial in the context of this case as a whole that they would not warrant a different result. *See Wyoming Bancorp*, 729 F.2d at 691, n. 4. The record as a whole contains substantial evidence in support of the Commission's conclusion that Amrep had engaged in a systematic pattern of unfair and deceptive conduct. This evidence being sufficient as a whole, our ruling is that the Commission's decision is affirmed.

### The Commission's Remedial Order

■ We finally consider Amrep's arguments that the Commission's remedial order was too broad. We have concluded that it is not. The Commission has broad discretionary authority to remedy unfair trade practices. *Federal Trade Commission v. National Lead Co.*, 352 U.S. 419, 429–31, 77 S.Ct. 502, 509–10, 1 L.Ed.2d 438 (1952); *Jacob Siegel Co. v. Federal Trade Commission*, 327 U.S. 608, 612–13, 66 S.Ct. 758, 760–61, 90 L.Ed. 888 (1946). We may not "lightly modify" an FTC order, and must uphold such an order if its provisions bear a "reasonable relationship" to the violations found and are not too indefinite. *Federal Trade Commission v. Colgate-Palmolive Co.*, 380 U.S. 374, 392, 85 S.Ct. 1035, 1046, 13 L.Ed.2d 904 (1965). As discussed more fully below, we find that the Commission's order does bear a reasonable relationship to Amrep's past unfair and

deceptive trade practices and affirm it in all respects.

■ Amrep's first argument is that when the Commission ordered Amrep not to enforce the illegal forfeiture clause contained in its form contracts, it effectively reformed Amrep's existing contracts. It argues that such a remedy exceeds the Commission's remedial authority, citing *Heater v. Federal Trade Commission,* 503 F.2d 321 (9th Cir.1974).

*Heater* stands only for the proposition that the Commission cannot order retroactive private relief (*e.g.,* restitutionary relief or rescission of a contract) in a cease and desist order. It does not impede the Commission from forbidding the enforcement of illegal contracts. If it did the Commission would be stripped of power. The Supreme Court has upheld the Commission's power to order respondents in proceedings before it not to enforce illegal contracts. *See, e.g., Atlantic Refining Company v. Federal Trade Commission,* 381 U.S. 357, 372, 375–77, 85 S.Ct. 1498, 1507, 1509–10, 14 L.Ed.2d 443 (1965). The Commission's order in this case falls squarely within the ambit of the *Atlantic Refining* holding. The Commission's order does not order Amrep to repay monies to past lot purchasers; it operates only prospectively, and merely prevents Amrep from continuing to profit from its inclusion of an illegal forfeiture clause in its past contracts. Accordingly, we find this portion of the Commission's order to be a proper exercise of its broad remedial discretion, *see Federal Trade Commission v. National Lead Co.,* 352 U.S. at 428–29, 77 S.Ct. at 508–09, and affirm it.

Amrep's second argument asserts that the Commission's order that Amrep make affirmative disclosures to past and prospective lot purchasers exceeds its remedial authority. FTC orders requiring affirmative disclosures and corrective advertising have often been sustained by the courts. *See, e.g., Warner-Lambert Co. v. Federal Trade Commission,* 562 F.2d 749, 756 (D.C.Cir.1977) (corrective advertising designed to correct misinformation given to past buyers), *cert. denied,* 435 U.S. 950, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978); *see also Grolier, Inc. v. Federal Trade Commission,* 699 F.2d 983 (9th Cir.) (mandatory disclosures to prospective book purchasers), *cert. denied,* —— U.S. ——, 104 S.Ct. 235, 78 L.Ed.2d 227 (1983); *Encyclopedia Britannica, Inc. v. Federal Trade Commission,* 605 F.2d 964 (7th Cir.1979) (same), *cert. denied,* 445 U.S. 934, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980). Here, the FTC has merely ordered Amrep to make affirmative disclosures designed to dissipate any misimpressions that purchasers might have as a result of Amrep's promotional tactics. We find this portion of the order to be reasonably related to Amrep's past violations and practices, *see Federal Trade Commission v. Colgate-Palmolive Co.,* 380 U.S. at 392, 85 S.Ct. at 1046, and affirm it.

■ Finally, Amrep contends that it has changed its line of business from sales of undeveloped lots to the general public to sales of developed lots (lots served by utilities) to the public. It argues that application of the FTC's remedial order to its new business exceeds the scope of the complaint and the violations that the Commission found. Amrep would have the courts refrain from the exercise of powers Congress has authorized. To so rule would result in the agency having no authority in the old or new line.

■ We find Amrep's argument to be without merit. FTC remedial orders may cover acts and practices other than those that were initially the subject of the Commission's complaint. *Federal Trade Commission v. Ruberoid Co.,* 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081 (1952), or products other than those that were the subject of the original complaint, *Sears, Roebuck & Co. v. Federal Trade Commission,* 676 F.2d 385, 391 (9th Cir.1982), when such broad proscriptions are necessary to prevent law violators from circumventing the Commission's orders. In this case, the Commission's order is designed to "fence in" Amrep, *see FTC v. National Lead,* 352 U.S. at 431, 77 S.Ct. at 510, and to prevent it from using new variants on its past

unfair and deceptive tactics to unjustly enrich itself at the expense of consumers. It is a reasonable exercise of the Commission's remedial authority and we affirm it.

### Conclusion

Our holding is that the Federal Trade Commission had jurisdiction to investigate and carry out the powers which the Congress gave it. It did not exceed any such powers. That which was exercised was supported by substantial evidence. Its order is a reasonable and proper exercise of its remedial authority.

We affirm the Commission's decision and order in all respects, and, pursuant to 15 U.S.C. § 45(c), order that it be enforced.